**No. 14-4764**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

TRINITY WALL STREET,

*Plaintiff-Appellee*

*v.*

WAL-MART STORES, INC.,

*Defendant-Appellant*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
CASE NO. 1-14-CV-00405 (HON. LEONARD P. STARK)

———————

**BRIEF FOR THE NATIONAL ASSOCIATION OF MANUFACTURERS AS**
***AMICUS CURIAE* IN SUPPORT OF APPELLANT**

———————

Linda Kelly
Patrick Forrest
NATIONAL ASSOCIATION OF
   MANUFACTURERS
733 10th Street, N.W., Suite 700
Washington, D.C.  20001
*Counsel for the National Association
   of Manufacturers*

Richard L. Wyatt, Jr.*
Neil K. Gilman
Steven M. Haas
Scott H. Kimpel
J. Steven Patterson
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C.  20037
Phone: (202) 955-1500
*Counsel of Record

*Attorneys for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned counsel certifies that the National Association of Manufacturers ("NAM") is a nonprofit trade association representing small and large manufacturers in a wide range of industrial sectors and in all 50 states. The NAM is the preeminent U.S. manufacturers' association as well as the nation's largest industrial trade association. The NAM has no parent corporation, and no publicly held company has 10% or greater ownership in the NAM.

Dated:  January 21, 2015                                    /s/ Richard L. Wyatt, Jr.
                                                            Richard L. Wyatt, Jr.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF *AMICUS CURIAE*............................................................. iv

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................... 1

BACKGROUND .................................................................................. 4

ARGUMENT ..................................................................................... 10

I.  The Proposal is Properly Excludable Because It Relates to Wal-Mart's Ordinary Business.............................................................................10

II.  The District Court Erred by Concluding that Because Trinity's Proposal Was Directed to the Board Of Directors, It Did Not Relate to an Ordinary Business Matter .................................................................14

III.  Exclusion of the Proposal Would Not Preclude Trinity from Expressing Its Views ....................................................................................16

CONCLUSION ...................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Express Scripts Holding Co. v. Chevedden*, No. 4:13-CV-2520-JAR, 2014
WL 631538 (E.D. Mo. Feb. 18, 2014)..................................................5

*Jana Master Fund, Ltd. v. CNET Networks, Inc.,*
954 A.2d 335 (Del. Ch. 2008) .................................................16, 17

*Medical Comm. for Human Rights v. SEC,*
432 F.2d 659 (D.C. Cir. 1970), *vacated as moot*, 404 U.S. 403 (1972)..............6

*Rosenblatt v. Getty Oil Co.*, 493 A.2d 929 (Del. 1985)..........................................14

REGULATIONS

SEC Release No. 34-3347, 7 Fed. Reg. 10,655 (1942) ............................................6

SEC Release No. 34-4979, 19 Fed. Reg. 246 (1954) ...............................................7

SEC Release No. 34-12999, 41 Fed. Reg. 52,994 (1976) ........................................7

SEC Release No. 34-20091, 48 Fed. Reg. 38,218 (1983) ........................................15

SEC Release No. 34-39093, 62 Fed. Reg. 50,682 (1997) ........................................15

SEC Release No. 34-40018, 63 Fed. Reg. 29,106 (1998) ...................7, 8, 9, 10, 14

Rule 14a-8 (17 C.F.R. §240.14a-8) ...............................................................*passim*

## OTHER AUTHORITIES

CONSOLIDATED FINANCIAL REPORT OF THE RECTOR, CHURCH-WARDENS,
    AND VESTRYMEN OF TRINITY CHURCH (Apr. 29, 2014)......................................17

Daniel M. Gallagher, SEC Comm'r, Remarks at the 26th Annual Corporate
    Law Institute, Tulane University Law School: *Federal Preemption of*
    *State Corporate Governance*, (Mar. 27, 2014) ...................................................6

HARVARD SHAREHOLDER RIGHTS PROJECT,
    http://srp.law.harvard.edu/index.shtml (last visited Jan. 15, 2015) ...................12

Leo E. Strine, Jr., *Breaking the Corporate Governance Logjam in*
    *Washington: Some Constructive Thoughts on a Responsible Path*
    *Forward*, 63 BUS. LAW. 1079 (2008) .................................................................13

Leo E. Strine, Jr., *Can We Do Better by Ordinary Investors? A Pragmatic*
    *Reaction to the Dueling Ideological Mythologists of Corporate Law*, 114
    COLUM. L. REV. 449 (2014) ...............................................................................6

Leo E. Strine, Jr., *One Fundamental Corporate Governance Question We*
    *Face: Can Corporations be Managed for the Long Term Unless Their*
    *Powerful Electorates Also Act and Think Long Term?*, 66 BUS. LAW. 1
    (2010) .............................................................................................................11

Margaret V. Sachs, *Social Proposals Under Rule 14a-8: A Fall-Back*
    *Remedy in an Era of Congressional Inaction,* 2 U.C. IRVINE L. REV. 931
    (2012).............................................................................................................4

Roberta Romano, *Less is More: Making Institutional Investor Activism a*
    *Valuable Mechanism of Corporate Governance*, 18 YALE J. ON REG. 174
    (2001).............................................................................................................5

SEC Staff Legal Bulletin No. 14E, 2009 WL 4363205 (Oct. 27, 2009) ................16

## INTEREST OF AMICUS CURIAE

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all fifty states. Manufacturing employs nearly twelve million men and women, contributes more than $1.8 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for two-thirds of private-sector research and development. The NAM serves as the voice of the manufacturing community and is the leading advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

The NAM regularly participates as *amicus curiae* in cases of particular importance to the manufacturing industry. This litigation raises issues of direct concern to the NAM and American industry as a whole. The vast majority of objectionable shareholder proposals are resolved by the staff of the Securities and Exchange Commission ("SEC" or the "Commission") through the "no-action" interpretive letter process, and few cases are ever litigated before the federal courts.[1] Fewer still ever reach an appellate court. Thus, judicial precedent on

---

[1] A "no-action" letter is one in which the staff of the SEC indicates that, on the basis of the facts presented to it, it will not recommend that the Commission institute enforcement proceedings against a party with respect to the matter discussed in the party's incoming correspondence.

these issues is limited.  Any interpretation of Rule 14a-8 by this Court will have far-reaching implications for public companies, including the many public manufacturing firms that are members of the NAM.

All parties, including counsel for Plaintiff-Appellee Trinity Wall Street ("Trinity"), have consented to the filing of this brief.  This brief was not authored in whole or in part by counsel for any party.  A party or a party's counsel did not contribute money that was intended to fund preparing or submitting this brief.  No person, other than *amicus curiae*, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

SEC Rule 14a-8, the shareholder proposal rule, requires a public company to include a shareholder proposal in its proxy statement for action at the company's annual meeting if the shareholder proponent satisfies various procedural and substantive requirements. The rule allows public company shareholders to include a proposal free of charge in the company's proxy materials. To be eligible to submit a proposal under the rule, a proponent need only own the lesser of $2,000 of company stock or one percent of the outstanding voting shares, whichever is less, for a period of one year, as well as through the date of the shareholders meeting at which the proposal will be considered. Although the rule gives shareholders wide latitude to make proposals, their rights are not unlimited when seeking to access the company's proxy statement. Of critical importance here, a shareholder proposal under Rule 14a-8 cannot relate to the "ordinary business" operations of the company.

The District Court erred because a proposal attempting to influence the types of products a retailer may sell clearly relates to an "ordinary business" matter. The District Court's analysis has troubling ramifications for public companies and manufacturers because it opens the door to the possibility that any lawful product that could draw some social objection is ripe for shareholder consideration.

1

Whether a proposal relates to "ordinary business" operations is a contextual question.  Here, the proposal targeted products that Trinity claims will have the "substantial potential to impair the reputation of the Company and/or would reasonably be considered by many offensive to the family and community values integral to the Company's promotion of its brand."  This subject matter is inherently subjective and open-ended, particularly for retailers selling a wide variety of products to an array of consumers.  It should be assumed that many products may be offensive to the views or values of one of countless constituencies in the domestic or even global marketplace.  The shareholder proposal rules were not intended to allow a shareholder referendum on how a retailer selects its inventory.  If the mix of products a retailer chooses to stock and sell is not subject to the ordinary business exception, that exception is rendered a nullity.

In addition, recasting Trinity's proposal as a request for board action, rather than management action, should not alter the analysis as to whether it is properly excludable.  Doing so would permit a shareholder proponent to circumvent the ordinary business exception by simply rewording the proposal.  The SEC has properly rejected such a form-over-substance approach.

Reversal of the District Court would not serve to silence Trinity.  The federal proxy rules do not empower a company to stop a shareholder from presenting its own independently financed proxy solicitation or from presenting a

2

proposal from the floor of the annual meeting.  Instead, the issue before this Court is whether Trinity can force Defendant-Appellant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company") to include the proposal in the Company's proxy statement, at the Company's expense, even when the Company opposes the proposal.

In sum, the District Court has improperly narrowed the ordinary business exception.  In doing so, it has upset a finely-calibrated balancing of interests between public companies and their shareholders.  Reversal of the District Court will serve to restore that balance.

## BACKGROUND

In the words of one securities law professor, "[i]n the constellation of federal securities laws, none is more unusual than the shareholder proposal rule . . . ." Margaret V. Sachs, *Social Proposals Under Rule 14a-8:  A Fall-Back Remedy in an Era of Congressional Inaction,* 2 U.C. IRVINE L. REV. 931, 932 (2012).  Each year, U.S. public companies are collectively deluged with hundreds of shareholder proposals.  The NAM's member companies are among those that regularly receive shareholder proposals.  One avenue for seeking to exclude an improper proposal is to present legal arguments to the SEC staff in the form of a request for a no-action letter.  In determining whether to grant no-action relief, the staff must frequently draw subtle distinctions among the thirteen separate substantive grounds for exclusion permitted under Rule 14a-8.

The process for seeking a no-action letter from the SEC staff is a costly one for public companies, not just in terms of professional fees paid to attorneys and other advisors, but also in distraction to management.  Based on a count of Rule 14a-8 no-action letters made publicly available on the SEC's website, the SEC staff either granted or denied no-action a total of 364 times in calendar year 2014, 370 times in 2013 and 344 times in 2012.  To process this inflow, the SEC staff assembles a "task force" of junior and senior attorneys to review and reply to incoming no-action letters, with multiple layers of review for each decision.  *See*

Declaration of Meredith B. Cross, Joint Appendix at 301-302 (July 11, 2014). Increasingly, public companies and proponents bypass the no-action letter process and litigate in federal district court. *See, e.g., Express Scripts Holding Co. v. Chevedden*, No. 4:13-CV-2520-JAR, 2014 WL 631538 (E.D. Mo. Feb. 18, 2014).

Of great concern to the NAM, the shareholder proposal process is increasingly dominated by activists advancing social or policy concerns that are divorced from increasing shareholder value. *See* Roberta Romano, *Less is More: Making Institutional Investor Activism a Valuable Mechanism of Corporate Governance*, 18 YALE J. ON REG. 174, 187 & n.37 (2001) (summarizing the results of "the most comprehensive studies of shareholder proposals" and stating that there is "no significant relation between proposal submissions and target firm performance"). Indeed, in a recent speech commenting on the 2013 proxy season, SEC Commissioner Daniel Gallagher observed:

> These proposals are not coming from ordinary shareholders concerned with promoting shareholder value for all investors. Rather, they are predominantly from organized labor, including union pension funds, which brought approximately 34% of last year's shareholder proposals, as well as social or policy investors and religious institutions, which accounted for about 25% of 2013's proposals. Approximately 40% were brought by an array of corporate gadflies, with a staggering 24% of those proposals brought by just two individuals. . . . Astonishingly, only 1% of proposals are brought by ordinary institutional investors—including hedge funds.

Daniel M. Gallagher, SEC Comm'r, Remarks at the 26th Annual Corporate Law Institute, Tulane University Law School:  *Federal Preemption of State Corporate Governance* (Mar. 27, 2014).

The cumulative result is a time-consuming process in which minority shareholders attempt to use the federal proxy rules to provide a mechanism to voice their views on a vast array of issues.  *See generally* Leo E. Strine, Jr., *Can We Do Better by Ordinary Investors? A Pragmatic Reaction to the Dueling Ideological Mythologists of Corporate Law*, 114 COLUM. L. REV. 449 (2014).  As the current Chief Justice of the Delaware Supreme Court has observed:

> By putting a proposal on the ballot in this way, a stockholder will necessarily require the corporation to spend hundreds of thousands of dollars on legal, administrative, and other costs, and require all other investors to bear the costs of having to have their money manager agents spend time and money considering how to vote and ultimately casting a vote.

*Id*. at 489 (footnote omitted).

The long history of the shareholder proposal rule makes it clear that Trinity's proposal is not of the kind the Commission ever envisioned as proper. The SEC enacted the predecessor to Rule 14a-8 in 1942.  SEC Release No. 34-3347, *Solicitation of Proxies Under the Act*, 7 Fed. Reg. 10,655 (1942).  In 1945, the SEC staff expressed the then-prevailing view that proposals of a political, social, or economic nature were generally off-limits.  *Medical Comm. for Human Rights v. SEC*, 432 F.2d 659, 677 (D.C. Cir. 1970), *vacated as moot*, 404 U.S. 403

(1972).  In 1954, the Commission adopted the precursor to the "ordinary business" exception, providing that management may "omit from its proxy material a proposal which is a recommendation or request with respect to the conduct of the ordinary business operations of the issuer."  SEC Release No. 34-4979, *Solicitation of Proxies*, 19 Fed. Reg. 246 (1954).

Following an increase in the early 1970s in shareholder proposals concerning social policy issues, the Commission next amended the "ordinary business" exclusion in 1976.  SEC Release No. 34-12999, *Adoption of Amendments Relating to Proposals by Security Holders*, 41 Fed. Reg. 52,994 (1976).  After considering (and rejecting) two alternative amendments, the Commission settled on a revised version of the "ordinary business" exception that permitted exclusion of a proposal if it "deals with a matter relating to the conduct of the ordinary business operations of the issuer."  *Id*. at 52,998.

In 1998, the SEC explained that the term "ordinary business" is a term of art referring to matters that are not necessarily "ordinary" in the common meaning of the word, and is "rooted in the corporate law concept providing management with flexibility in directing certain core matters involving the company's business and operations."  SEC Release No. 34-40018, *Amendments to Rules on Shareholder Proposals*, 63 Fed. Reg. 29,106, 29,107 (1998) (hereinafter "1998 Release").  The 1998 Release also reiterated that the general underlying policy of the exclusion is

consistent with state corporate laws, and is intended "to confine the resolution of ordinary business problems to management and the board of directors, since it is impracticable for shareholders to decide how to solve such problems at an annual shareholders meeting." *Id.* at 29,108.

Accordingly, the Commission underscored that the policy underlying the ordinary business exclusion rests on two central considerations. *See id.* The first consideration relates to the subject matter of the proposal. In that respect, the Commission indicated that "[c]ertain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight." *Id.* As examples, the Commission cited "the management of the workforce, . . . decisions on production quality and quantity, and the retention of suppliers." *Id.* If the underlying subject matter of a proposal relates to an area of the company's business operations, it is excludable under Rule 14a-8(i)(7) unless it focuses on "sufficiently significant social policy issues (e.g., significant discrimination matters)", because such proposals "raise policy issues so significant that it would be appropriate for a shareholder vote." *Id.* The second consideration concerns the degree to which a proposal seeks to ''micro-manage'' a company. If a proposal probes "too deeply into matters of a complex nature upon which shareholders, as a group, would not

8

be in a position to make an informed judgment" the proposal is also excludable under Rule 14a-8(i)(7).  *Id.*

**ARGUMENT**

## I.    The Proposal is Properly Excludable Because It Relates to Wal-Mart's Ordinary Business

There is no business function for a retailer more fundamental than selection of the products that will be offered to customers. As Wal-Mart's opening brief notes, over the years the staff of the SEC has considered numerous requests for no-action on the excludability of proposals dealing with retailer merchandise selection, and regularly finds these proposals excludable on ordinary-business grounds. *See, e.g.*, Wal-Mart's Opening Brief at 22 n.4, 31. This result is not surprising. The Commission permits the exclusion of a proposal under the ordinary business exception when it relates to "decisions on production quality and quantity" or the "retention of suppliers" or when it seeks to "micro-manage" the company. *See* 1998 Release at 29,108. As in the numerous no-action letters cited by Wal-Mart, each of these criteria is satisfied with respect to Trinity's proposal.

Furthermore, the proposal does not focus on a significant policy issue. The proposal seeks to address a broad swath of products that endanger "public safety" or "well-being", that have "the potential to impair the reputation" of the company and that are "offensive" to "family and community values." The SEC has never held that products purporting to meet these idiosyncratic criteria raise significant policy issues. In fact, these highly subjective descriptors could apply to a wide variety of lawful products offered for sale at any retailer. And the analysis would

necessarily change based on the local geography, cultural norms, and social customs. The District Court's analysis is troubling because any lawful product could potentially draw some social objection from someone. Thus, a company's decision to sell almost any product would be ripe for shareholder consideration under the District Court's reasoning. It was this problematic result, however, that the Commission sought to avoid as it adopted and refined the ordinary business exception over the past 60 years.

The shareholder proposal rules were not intended to permit shareholders to inject themselves into a business's ordinary business matters. Nor were they intended to allow a shareholder referendum on how a retailer selects its inventory. If the mix of products a retailer chooses to stock and sell is not subject to the ordinary business exception, that exception is meaningless. As the current Chief Justice of the Delaware Supreme Court has written, if

> every action of management is the subject of a stockholder plebiscite, the time and attention of managers will be increasingly diverted from profit-producing activities into more 'political' activities centered on addressing referenda items propounded by particular stockholders, who often have no long-term commitment to remaining as stockholders and who owe other stockholders no fiduciary duties.

Leo E. Strine, Jr., *One Fundamental Corporate Governance Question We Face: Can Corporations be Managed for the Long Term Unless Their Powerful Electorates Also Act and Think Long Term?*, 66 BUS. LAW. 1, 4 (2010).

11

A ruling by this Court that Trinity's proposal is not excludable could have serious implications for U.S. public companies, including manufacturers. Emboldened by such a ruling, and with the ordinary business exception blue-penciled out of the SEC's regulations, in future years it is likely that shareholders will submit an endless supply of resolutions that were previously excludable on ordinary business grounds.  This concern is not a theoretical one, as there are several well-known shareholder activists that select a single issue then routinely submit proposals on that topic to large numbers of public companies for inclusion in management's proxy statement.  For example, the Harvard Shareholder Rights Project has made declassification of boards of directors its central mission under the Rule 14a-8 process, boasting of "121 successful engagements" from 2012 to 2014.  *See* HARVARD SHAREHOLDER RIGHTS PROJECT, http://srp.law.harvard.edu/index.shtml (last visited Jan. 20, 2015).

Product selection is a complicated task influenced by economic trends, data analytics, demographics, customer preferences, supply chain flexibility, shipping costs and lead-times, and a host of other factors best left to companies' management and boards of directors.  With the annual specter that any shareholder holding $2,000 of company stock could force a referendum on inventories, any kind of long-term business planning (as well as contractual negotiations, financing arrangements, marketing campaigns and product advertising) would be adversely

12

impacted.  *See generally* Leo E. Strine, Jr., *Breaking the Corporate Governance Logjam in Washington: Some Constructive Thoughts on a Responsible Path Forward*, 63 BUS. LAW. 1079, 1100 (2008) ("One can rationally doubt whether Rule 14a-8 was or should be intended to give investors with a trifling economic stake in a particular corporation access to a subsidized bully pulpit, with the costs borne by others who are actually investing as investors.").  Not only would retailers feel this disruption, but so would manufacturers and others in the supply chain that deliver inventory for sale.

Additionally, manufacturing firms often operate a research and development cycle for new products that spans many years.  New products are frequently developed in collaboration with retail partners based on forecasts of customer demand.  Some products are developed on a bespoke basis for a single retail customer.  While there is always the commercial risk that soft demand could impact the sales of a product once it is brought to market, shareholder referendum is not a variable that manufacturers or retailers should be expected to consider.  The lingering possibility that shareholders could, on just a few months' notice, pressure a company not to carry a particular product would have an adverse impact on innovation and the development of new products for the American consumer.

13

**II.    The District Court Erred By Concluding that Because Trinity's Proposal Was Directed to the Board Of Directors, It Did Not Relate To An Ordinary Business Matter**

It is axiomatic that management runs the day-to-day operations of a business, under the oversight of the board of directors.  *See, e.g., Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 943 (Del. 1985) ("directors cannot be expected to manage the day-to-day activities of a company").  Recasting Trinity's proposal as a request for board action, as opposed to management action, should not alter the analysis as to whether it is properly excludable.  As a threshold matter, the District Court improperly emphasized that the proposal was directed to Wal-Mart's board of directors rather than its managers.  *See* Dist. Ct. Op. at 17 ("At its core, Trinity's Proposal seeks to have Wal-Mart's ***Board*** oversee the . . .  policy.") (emphasis in original); *id.* at 18 (stating that "[a]ny direct impact of adoption of Trinity's Proposal would be felt ***at the Board level***") (emphasis added); *see also id.* ("Trinity's Proposal leaves development of policy to the Board Committee, which in turn is free to delegate responsibility . . . to the Company's officers and employees").  This analysis places form over substance.

Purporting to involve the board of directors does not mean the proposal fell outside the ordinary business exception.  To the contrary, the SEC has consistently stated that ordinary business operations are not limited to those conducted by officers or employees.  *See* 1998 Release at 29,108 (explaining that Rule 14a-

14

8(i)(7)'s purpose is to "confine the resolution of ordinary business problems to management *and the board of directors*") (emphasis added); SEC Release No. 34-39093, *Amendments to Rules on Shareholder Proposals*, 62 Fed. Reg. 50,682, 50,683 (1997) (explaining that the ordinary business exclusion separates the "spheres of authority for the board of directors on one hand, and the company's shareholders on the other").  Otherwise, whether a proposal can be excluded depends on how it is framed and to whom, rather than the substance of the proposal.  The SEC has properly rejected such an approach.

The District Court's analysis on the fact that the proposal requested a board-level policy likewise places form over substance.  In contrast, both the Commission and the SEC staff have focused on the underlying subject matter of a proposal rather than whether a proposal requests implementation of a corporate governance policy or procedure.  *See* SEC Release No. 34-20091, *Amendments to Rule 14a-8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders*, 48 Fed. Reg. 38,218, 38,221 (1983) ("In the past, the staff has taken the position that proposals requesting issuers to prepare reports on specific aspects of their business or to form special committees to study a segment of their business would not be excludable under Rule 14a-8(c)(7).  Because this interpretation raises form over substance and renders the provisions of paragraph (c)(7) largely a nullity, . . . . [h]enceforth, the staff will consider whether the

15

subject matter of the special report or the committee involves a matter of ordinary business; where it does, the proposal will be excludable under Rule 14a-8(c)(7).").  *See also* Staff Legal Bulletin No. 14E, 2009 WL 4363205, at *2 (Oct. 27, 2009) ("[W]e will instead focus on the subject matter to which the risk pertains or that gives rise to the risk.").  Otherwise, the "ordinary business" exclusion under Rule 14a-8(i)(7) would be circumvented whenever a proposal is framed as requesting board "oversight."

## III.  Exclusion of the Proposal Would Not Preclude Trinity from Expressing Its Views

Reversal of the District Court would not silence Trinity.  To the contrary, Trinity has a right under Delaware law to present proposals from the floor at Wal-Mart's annual meeting.  Trinity may also choose to attend the annual meeting and request that the board of directors implement the requested policy.  Rather, the issue before this Court is simply whether Trinity can force Wal-Mart to include the proposal in the Company's proxy statement, at the Company's expense, even when the Company opposes the proposal.

The federal proxy rules do not give a company the power to stop shareholders from presenting proposals.  *Jana Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 342 (Del. Ch. 2008).  Rule 14a-8 only serves as a limit on a shareholder's ability to present a proposal using a company's proxy statement.  *Id.* at 341-2.  If a shareholder desires to put a proposal before the other

shareholders in the form of a floor proposal or an independently financed proxy solicitation, the federal securities laws do not require a shareholder to seek the company's consent, and the shareholder is free to do so.  *See id.* at 342.

Indeed, Trinity's most-recent, publicly-available audited financial statements show total assets in excess of $800 million, including over $27 million in cash and over $200 million in investments.  CONSOLIDATED FINANCIAL REPORT OF THE RECTOR, CHURCH-WARDENS, AND VESTRYMEN OF TRINITY CHURCH, at 3 (Apr. 29, 2014).[2]  These financial statements reveal that Trinity is an experienced financial investor with holdings both domestically and abroad in a wide range of asset classes, including not only equity securities and mutual funds, but also complex financial products such as commodities, oil and gas interests, venture capital funds, and hedge funds.  *Id.* at 14.  Such a sophisticated investor would appear to have the financial wherewithal to fund its own proxy solicitation if it chose to do so.  And, of course, there are numerous other ways in which Trinity can publicly express its beliefs in a free society.

---

[2] The financial statements are available at:
http://www.trinitywallstreet.org/sites/default/files/TrinityWallStreet2013Financial
Statement.pdf

## CONCLUSION

For the foregoing reasons, the National Association of Manufacturers respectfully urges this Court to reverse and vacate the opinion of the District Court.

January 21, 2015                                    Respectfully submitted,

 

                                                   /s/ Richard L. Wyatt, Jr.

Linda Kelly                                        Richard L. Wyatt, Jr.*
Patrick Forrest                                    Neil K. Gilman
NATIONAL ASSOCIATION OF                            Steven M. Haas
  MANUFACTURERS                              Scott H. Kimpel
733 10th Street, N.W., Suite 700                   J. Steven Patterson
Washington, D.C.  20001                            HUNTON & WILLIAMS LLP
*Counsel for the National Association*             2200 Pennsylvania Avenue, N.W.
  *of Manufacturers*                       Washington, D.C.  20037
                                                   Phone: (202) 955-1500
                                                   *Counsel of Record

                                                   *Attorneys for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 3,947 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010, in 14 pt. Times New Roman.

Dated:      January 21, 2015        /s/ Richard L. Wyatt, Jr.
                                        Richard L. Wyatt, Jr.

## CERTIFICATION OF IDENTICAL COMPLIANCE OF BRIEF

I, Richard L. Wyatt, Jr., hereby certify that the electronic version of this brief is identical to the text version in the paper copies that were dispatched via overnight delivery to the Clerk of the Court of the United States Court of Appeals for the Third Circuit.

Dated:      January 21, 2015          /s/ Richard L. Wyatt, Jr.
                                      Richard L. Wyatt, Jr.

## VIRUS CERTIFICATION

I, Richard L. Wyatt, Jr., hereby certify that this document was scanned using

Symantec$^{TM}$ Endpoint Protection 11.0.7000.975 and no viruses were detected.

Dated:         January 21, 2015              /s/ Richard L. Wyatt, Jr.
                                             Richard L. Wyatt, Jr.

## CERTIFICATION OF COUNSEL

I, Richard L. Wyatt, Jr., hereby certify that I am a member of the bar of this

court.

Dated:        January 21, 2015            /s/ Richard L. Wyatt, Jr.
                                          Richard L. Wyatt, Jr.

## CERTIFICATE OF SERVICE

I, Richard L. Wyatt, Jr., certify that on this 21st day of January, 2015, I caused seven (7) copies of this Brief of Amicus Curiae, the National Association of Manufacturers, to be dispatched via overnight delivery to the Clerk of the Court for the United States Court of Appeals for the Third Circuit, and filed and served an electronic copy of the brief via CM/ECF for all counsel of record. I certify that counsel of record for the parties are filing users of the Court's CM/ECF system.

Dated:        January 21, 2015                /s/ Richard L. Wyatt, Jr.
                                              Richard L. Wyatt, Jr.