**No. 14-4764**

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT
_____

### TRINITY WALL STREET,

*Plaintiff-Appellee,*

v.

### WAL-MART STORES, INC., A DELAWARE CORPORATION,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF DELAWARE

Case No. 14-405-LPS
The Honorable Leonard P. Stark, United States District Judge

### APPELLEE'S ANSWERING BRIEF

FRIEDLANDER & GORRIS, P.A.
Joel Friedlander
Christopher M. Foulds
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
(302) 573-3500
jfriedlander@friedlandergorris.com
cfoulds@friedlandergorris.com

*Counsel for Plaintiff-Appellee*

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rules of Appellate Procedure 26.1 and 28(a)(1), plaintiff-appellee Trinity Wall Street states it has no parent corporation, and that no publicly-held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Pages**

INTRODUCTION ............................................................................................1

STATEMENT OF JURISDICTION........................................................9

ISSUES PRESENTED...............................................................................10

STATEMENT OF NO RELATED CASES OR PROCEEDINGS........................10

STATEMENT OF FACTS ........................................................................11

I.      Wal-Mart's Corporate Ethic and Merchandising Practices...........................11

II.     Genesis of the Proposal ................................................................15

III.    Wal-Mart Requests and Obtains a No-Action Letter ....................................20

IV.     Trinity Commences Suit................................................................21

SUMMARY OF ARGUMENT ................................................................24

STANDARD OF REVIEW .......................................................................26

ARGUMENT ..............................................................................................26

THE DISTRICT COURT CORRECTLY HELD THAT THE PROPOSAL
MAY NOT BE EXCLUDED UNDER RULE 14a-8..............................................26

I.      Regulatory Framework ..................................................................26

II.     The Proposal Does Not Fall Within the "Ordinary Business
        Operations" Exception..................................................................32

        A.      The Proposal Does Not Concern Wal-Mart's Ordinary Business ......37

B.       In Any Event, The Proposal Focuses On Important Policy
         Matters That Transcend Wal-Mart's Ordinary Business ...................42

C.       No-Action Letters Are Entitled to Deference Only to the Extent
         of the Persuasiveness of Their Reasoning............................................48

D.       Inclusion of the Proposal Will Not Open Any "Floodgates"..............52

III.    The Proposal Is Not Excludable Under Rule 14a-8(i)(3) as "So
        Inherently Vague or Indefinite".....................................................................54

CONCLUSION .....................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Rules and Statutes

15 U.S.C. § 78a ........................................................................................9

15 U.S.C. § 78aa ......................................................................................9

15 U.S.C. § 78n .......................................................................................26

28 U.S.C. § 1291 .....................................................................................10

28 U.S.C. § 1331 ......................................................................................9

17 C.F.R. § 240.14a-8(i)(3) ........................................................... *passim*

17 C.F.R. § 240.14a-8(i)(7) ........................................................... *passim*

17 C.F.R. § 240.14a-8 *et seq.* ...................................................... *passim*

7 Fed. Reg. 10,659 (1942) .....................................................................26

41 Fed. Reg. 52,994 (1976) ("1976 Amendments") ..............................34

## Cases

*Am. Fed'n of State, Cnty. & Mun. Emps. v. Am. Int'l Grp., Inc.*,
462 F.3d 121 (2d Cir. 2006).....................................................26, 28, 49

*Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*,
821 F. Supp. 877 (S.D.N.Y. 1993) ................................................ *passim*

*Apache Corp. v. N.Y.C. Emps. Ret. Sys.*,
621 F. Supp. 2d 444 (S.D. Tex. 2008).......................................30, 32, 42

*Austin v. Consol. Edison Co.*,
788 F. Supp. 192 (S.D.N.Y. 1992) .......................................................52

*Donoghue v. Accenture Ltd.*,
No. 03 Civ. 8329, 2004 WL 1823448 (S.D.N.Y. Aug. 16, 2004)..........52

*Grimes v. Centerior Energy Corp.*,
909 F.2d 529 (D.C. Cir. 1990)................................................34, 37, 42

*Grimes v. Donald*,
No. Civ. A. 13358,1995 WL 54441 (Del. Ch. Jan. 11, 1995),
*aff'd*, 673 A.2d 1207 (Del. 1996)..............................................................41

*Gryl ex rel. Shire Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*,
298 F.3d 136 (2d Cir. 2002)....................................................................31

*In re New Times Secs. Servs., Inc.*,
371 F.3d 68 (2d Cir. 2004)......................................................................31

*J.I. Case Co. v. Borak*,
377 U.S. 426 (1964)................................................................................27

*Lovenheim v. Iroquois Brands, Ltd.*,
618 F. Supp. 554 (D.D.C. 1985)..............................................................32

*Med. Comm. for Human Rights v. S.E.C.*,
432 F.2d 659 (D.C. Cir. 1970).....................................................27, 41, 48

*Morrison v. Madison Dearborn*,
463 F.3d 312 (3d Cir. 2006)....................................................................30

*N.Y.C. Ret. Sys. v. Am. Brands, Inc.*,
634 F. Supp. 1382 (S.D.N.Y. 1986) ..................................................28, 32

*N.Y.C. Emps' Ret. Sys. v. Dole Food Co.*,
795 F. Supp. 95 (S.D.N.Y, 1992)......................................................32, 42

*N.Y.C. Ret. Sys. v. SEC*,
45 F.3d 7 (2d Cir. 1995).........................................................................31

*Nicini v. Morra*,
212 F.3d 798 (3d Cir. 2000).....................................................................26

*Register v. PNC Fin. Servs. Grp. Inc.*,
477 F.3d 56 (3d Cir. 2007)......................................................................33

*Ret. Bd. of Policemen's Annuity & Benefit Fund of City of Chicago v.
Bank of New York Mellon*,
No. 11 Civ. 5459(WHP), 2013 WL 593766 (S.D.N.Y. Feb. 14, 2013) .................32

*Roosevelt v. E.I. DuPont de Nemours & Co.*,
958 F.2d 416 (2d Cir. 1992)............................................................28, 29, 41

iv

## No-Action Letters

*Apache Corp.*, No-Action Letter,
2008 WL 615894 (Mar. 5, 2008) ................................................................46

*Assocs. First Capital Corp.*, No-Action Letter,
1999 WL 68604 (Feb. 12, 1999) ................................................................57

*Avaya Inc.*, No-Action Letter,
2006 WL 3007364 (Oct. 18, 2006) ............................................................55

*Bank of America,* No-Action Letter,
2010 WL 4922465 (Feb. 24, 2010) ............................................................46

*Berkshire Hathaway Inc.*, No-Action Letter,
2011 WL 6859125 (Jan. 31, 2012) ............................................................58

*Boeing Co.*, No-Action Letter,
2011 WL 757455 (Mar. 2, 2011) ...............................................................58

*Cent. Fed. Corp.*, No-Action Letter,
2010 WL 943083 (Mar. 8, 2010) ...............................................................46

*Citigroup Inc.*, No-Action Letter,
2008 WL 524150 (Feb. 21, 2008) ..............................................................51

*Citigroup Inc.*, No-Action Letter,
2012 WL 6723109 (Feb. 15, 2013) ............................................................51

*ConocoPhillips*, No-Action Letter,
2005 WL 484408 (Feb. 24, 2005) ..............................................................57

*Dean Foods Co.*, No-Action Letter,
2007 WL 754960 (Mar. 9, 2007) ...............................................................46

*Denny's Corp.*, No-Action Letter,
2009 WL 772857 (Mar. 17, 2009) .......................................................48, 52

*Dillards, Inc.*, No-Action Letter,
2012 WL 173764 (Feb. 27, 2012) ..............................................................47

*Dominion Res., Inc.*, No-Action Letter,
2011 WL 494126 (Feb. 9, 2011)..............................................................................57

*The Home Depot, Inc.*, No-Action Letter,
2008 WL 257307 (Jan. 25, 2008) ...........................................................................51

*Intel Corp.*, No-Action Letter,
2012 WL 160565 (Feb. 23, 2012)...........................................................................56

*iRobot Corp.*, No-Action Letter,
2013 WL 267335 (Mar. 26, 2013) ..........................................................................55

*JPMorgan Chase & Co.*, No-Action Letter,
 2010 WL 147293 (Mar. 12, 2010)..........................................................................46

*Kroger Co.*, No-Action Letter,
2002 WL 1052022 (Apr. 12, 2002) .........................................................................58

*Mattel, Inc.*, No-Action Letter,
2012 WL 483197 (Feb. 10, 2012)...........................................................................46

*Merck & Co.*, No-Action Letter,
2003 WL 942796 (Feb. 26, 2003)...........................................................................56

*Motorola, Inc.*, No-Action Letter,
2002 WL 480349 (Mar. 8, 2002) ............................................................................51

*NetApp, Inc.*, No-Action Letter,
2014 WL 1878421 (June 27, 2014) .........................................................................57

*Newmont Mining Corp.*, No-Action Letter,
2007 WL 403867 (Feb. 5, 2007)...............................................................................51

*Nordstrom, Inc.*, No-Action Letter,
2000 WL 430825 (Mar. 31, 2000) ..........................................................................53

*PepsiCo, Inc.*, No-Action Letter,
2012 WL 542708 (Feb. 16, 2012).............................................................................41

*PetSmart, Inc.*, No-Action Letter,
2011 WL 528414 (Mar. 24, 2011) ..........................................................45

*Puget Energy, Inc.*, No-Action Letter,
2002 WL 523341 (Mar. 7, 2002) ............................................................58

*Rite Aid Corp.*, No-Action Letter,
2009 WL 829472 ....................................................................................47

*Sears, Roebuck & Co.*, No-Action Letter,
1999 WL 80272 (Feb. 16, 1999).............................................................53

*Sempra Energy*, No-Action Letter,
 2011 WL 6425347 (Jan. 12, 2012) .........................................................40

*Staples, Inc.*, No-Action Letter,
2012 WL 748854 (Mar. 5, 2012).............................................................58

*Walgreen Co.*, No-Action Letter,
1997 WL 599903 (Sep. 29, 1997)............................................................47

*Wal-Mart Stores, Inc.*, No-Action Letter,
1999 WL 152447 (Mar. 15, 1999) ..........................................................46

*Wal-Mart Stores, Inc.*, No-Action Letter,
2008 WL 5622715 (Feb. 27, 2008)..........................................................51

*Wal-Mart Stores, Inc.*, No-Action Letter,
2010 WL 369421 (Mar. 31, 2010)......................................................48, 52

*Walt Disney Co.*, No-Action Letter,
2012 WL 5267955 (Dec. 13, 2012) ........................................................55

*Western Union Co.*, No-Action Letter,
2011 WL 916163 (Mar. 14, 2011)...........................................................40

*Western Union Co.*, No-Action Letter,
2013 WL 368364 (Mar. 14, 2013)...........................................................56

*Wyeth*, No-Action Letter,
2005 WL 326905 (Feb. 8, 2005)..............................................................48

*Yahoo! Inc.*, No-Action Letter,
2007 WL 1175903 (Apr. 16, 2007) ........................................................55

## **Other Authorities**

Donna M. Nagy, *Judicial Reliance on Regulatory Interpretations in SEC
No-Action Letters: Current Problems and a Proposed Framework*, 83
Cornell L. Rev. 921 (1998) .....................................................................30

Press Release, SEC, *SEC to Hold Roundtable on Proxy Voting*, (Jan. 27,
2015) *available at* http://www.sec.gov/news/pressrelease/201515.html#.VMj
XRvkRAjI ................................................................................................27

Proposed Amendments to Rule 14a-8, Exchange Act Release No. 19,135,
1982 WL 600869 (Oct. 14, 1982)......................................................28, 39

SEC Division of Corporation Finance, *Informal Procedures Regarding
Shareholder Proposals*, SEC, *available at* http://www.sec.gov/divisions/cor
pfin/cf-noaction/14a-8-informal-procedures.htm (last modified Nov. 2,
2011). ......................................................................................................29

SEC, *SEC Interpretive Releases*, *available at*
www.sec.gov/rules/interp.shtml................................................................29

SEC Release, No. 34-12599, 1976 WL 160411 (July 7, 1976)...............50

SEC Release No. 34-40018, 1998 WL 254809 (May 21, 1998)....................  *passim*

Staff Legal Bulletin No. 14 (CF), 2001 WL 34886112 (July 13, 2001) .................31

Staff Legal Bulletin No. 14C (CF), 2005 WL 6767321 (June 28, 2005)................36

Staff Legal Bulletin No. 14B, 2004 WL 3711971 (Sept. 15, 2004)....................22,54

Staff Legal Bulletin No. 14E, 2009 WL 4363205 (Oct. 27, 2009) ..............5, 37, 43

## **INTRODUCTION**

This appeal concerns the propriety under Securities and Exchange Commission ("SEC") Rule 14a-8, 17 C.F.R. § 240.14a-8, of a stockholder proposal concerning improved corporate governance (the "Proposal") at Defendant-Appellant Wal-Mart Stores, Inc. ("Wal-Mart" or the "Company"). Plaintiff-Appellee Trinity Wall Street ("Trinity") submitted the Proposal to redress weaknesses in the governance practices of Wal-Mart's Board of Directors that became apparent in the highly public aftermath of the December 2012 mass killing at Sandy Hook Elementary School in Newtown, Connecticut, the latest in a recurrent horror of similar mass killings at Columbine High School, Virginia Tech, Fort Hood, Tucson, the Sikh temple in Oak Creek, and Aurora. Wal-Mart became a subject of protest, due to its prominence in the retail gun market and its marketing of the Bushmaster AR 15, the same model of assault rifle used by the mass killer in Newtown.

Wal-Mart is the world's largest retailer. When deciding what products it will make freely accessible for purchase, Wal-Mart knows that certain products are especially dangerous to the public, the Company's reputation and/or its family brand identity, and also knows that large segments of the public may strongly oppose or support certain merchandising decisions, given larger socio-political debates gripping the country. As described below under the heading "Wal-Mart's

Corporate Ethic and Merchandising Practices," Wal-Mart chooses not to sell certain products for which there is customer demand, such as handguns or music marked with a parental advisory label because the lyrics depict violence. Wal-Mart does sell rifles equipped with high capacity ammunition clips holding many rounds. Despite the reality – indeed the necessity – of making merchandising choices for these especially dangerous products in the face of public controversy, no Board committee at Wal-Mart is tasked with the responsibility of overseeing the formulation and implementation of standards and policies that determine by what process and under what criteria the Company should sell products especially dangerous to the communities Wal-Mart serves or to its reputation or brand identity.

Trinity's Proposal addresses that gap in the Company's governance. The Proposal does not request that Wal-Mart cease selling any product or class of products. Rather, it requests for these especially dangerous products, as defined in the Proposal, reasonably transparent policy formulation and implementation with Board oversight. As Trinity's Rector explains, "consistent with its past practice [of] focusing on fostering discussion and voluntary but carefully considered choice, Trinity has sought to suggest a governance mechanism that would lead to such deliberation and choice for a company like Wal-Mart." (A-248 ¶ 7) (Decl. of James H. Cooper).

2

Rule 14a-8 requires with certain narrow exceptions that stockholder proposals be included in a company's proxy materials.  The Rule establishes procedures by which stockholders who cannot attend an annual meeting can nonetheless vote upon proposals brought before the meeting.  Wal-Mart does not dispute that the Proposal is a proper subject of a vote at an annual meeting of its stockholders.  Wal-Mart conceded as much in the District Court when it argued that a preliminary injunction should not issue for lack of irreparable injury: "Trinity . . . could have presented its Proposal for a vote at the 2014 annual meeting by submitting it under Wal-Mart's Bylaws, and then mailing its own proxy materials to other shareholders, at its own expense."  Letter to Hon. Leonard P. Stark from Philip A. Rovner, No. 14-405 (LPS), Docket No. 11, at 5 (D. Del. Apr. 3, 2014).  Instead, Wal-Mart seeks to preclude Trinity from exercising its shareholder right to engage its fellow shareholders through the proxy process.

Wal-Mart has abandoned procedural arguments it made below that would have made it impossible for a stockholder to secure its rights under Rule 14a-8. Wal-Mart no longer contends that litigation over the Proposal is both moot and unripe.  Wal-Mart also no longer asserts that an injunction should not issue for lack of irreparable injury.  Wal-Mart also disclaims any argument that the Proposal seeks to impermissibly micro-manage the operations of the Company.

Wal-Mart's remaining arguments fare no better.  Contrary to Wal-Mart's

3

opening brief ("OB"), Chief Judge Stark's decision does not "threaten[] to undo nearly 40 years of SEC guidance on its own rule," much less "contradict[] . . . and contravene[] longstanding SEC guidance on and interpretation of the rule."  OB 1, 4.  The Commissioners of the SEC last authoritatively interpreted the "ordinary business" exclusion of Rule 14a-8 when the SEC issued SEC Release No. 34-40018, 1998 WL 254809, at *2 (May 21, 1998) (the "1998 Adopting Release").  Chief Judge Stark properly recognized that the 1998 Adopting Release "strongly supports the Court's conclusions."  (A-20).

The 1998 Adopting Release makes clear that the ordinary business exclusion excludes proposals directed to "day-to-day" management tasks that "could not, as a practical matter, be subject to direct shareholder oversight," but allows even those proposals relating to such day-to-day operations if they "raise policy issues so significant as to be appropriate for a shareholder vote."  1998 WL 254809, at *4.  The Proposal is aimed at Board oversight of Company policy respecting the sale of especially dangerous products, not day-to-day management tasks.  It also focuses on two significant social policies – the danger to the public and the danger to the Company's reputation from the sale of especially dangerous products.  Chief Judge Stark cited both social policies:

> The significant social policy issues on which the Proposal focuses
> include the social and community effects of sales of high capacity
> firearms at the world's largest retailer and the impact it could have on

4

>Wal-Mart's reputation, particularly if such a product sold at Wal-Mart
>is misused and people are injured or killed as a result.

(A-20 to A-21).

Chief Judge Stark also properly recognized that the Proposal is focused on corporate governance and Board oversight respecting matters of social concern. He cited a recent SEC Staff Bulletin which states: "a proposal that focuses on the board's role in the oversight of a company's management of risk may transcend the day-to-day business matters of a company and raise policy issues so significant that it would be appropriate for a shareholder vote." SEC Staff Legal Bulletin No. 14E, 2009 WL 4363205 (Oct. 27, 2009).

Law firms now representing *amici curiae* previously told their clients that Chief Judge Stark's decision does not contradict any longstanding SEC interpretation of Rule 14a-8(i)(7). According to the law firm now representing Retail Litigation Center ("RLC"): "Although it provides an important reference point in an area of Rule 14a-8 practice that is lacking clear guideposts, *Trinity Wall Street* likely does not, at least in the short term, significantly alter the Rule 14a-8 process around the ordinary business exception, which has always been an area of inconsistent decisions by courts and the SEC's staff."[1] Similarly, the law firm

---

[1] *Trinity Wall Street v. Wal-Mart Stores, Inc. Provides New (But Limited) Guidance on the Ordinary Business Exception to Rule 14a-8*, Wilson Sonsini

5

representing The National Association of Manufacturers ("NAM") wrote in

December:  "The Court's Ruling Is Noteworthy, Not Unprecedented."[2]

Wal-Mart's argument that Chief Judge Stark ignored longstanding SEC

guidance is not based on a close reading of the 1998 Adopting Release or any

discussion of the social issues addressed by the Proposal.  Instead, Wal-Mart relies

on the cursory no-action letter issued by the SEC staff, which found "some basis"

for Wal-Mart's decision to exclude the Proposal, noting only that it "relates to the

products and services offered for sale by the company."  (A-288).  In fact, the

Proposal is focused on the oversight of policy development respecting the sale of

products especially dangerous to the community as well as the Company.

Wal-Mart devotes portions of fifteen pages of its opening brief to discussing

37 no-action letters issued by the staff of the SEC's Division of Corporation

Finance (the "Division") respecting other stockholder proposals.  These no-action

letters do not address any proposal identical or similar to Trinity's Proposal.  The

SEC staff has never previously been asked to consider the appropriateness of a

---

Goodrich & Rosati "WSGR Alert," 2 (Dec. 15, 2014),
https://www.wsgr.com/publications/PDFSearch/wsgralert-rule-14a-8.pdf.

[2] *Federal Court Overrules SEC Staff No-Action Letter Excluding Shareholder Proposal*, Hunton & Williams LLP "Client Alert," 2 (Dec. 2014), http://www.hunton.com/files/News/97e81171-e8eb-4163-a8be-bb612b4b2108/Presentation/NewsAttachment/dbdc30a9-5542-4f3c-9cb0-bde7dc824f0c/federal-court-overrules-sec-staff-no-action-letter-excluding-shareholder-proposal.pdf.

stockholder vote on the question whether a board should oversee the risks posed by the sale of products that are especially dangerous to a community as well as a company, but the staff has in any event recognized on numerous occasions that matters relating to corporate governance or social policy may not be excluded as ordinary business.

Chief Judge Stark's decision opens no floodgates. For even a retailer of Wal-Mart's size, a single stockholder proposal is sufficient to raise the question of the Board's proper role in overseeing policy development about the sale of products that pose special danger to the corporation's reputation or brand or the communities it serves. Moreover, the Proposal is particularly tied to Wal-Mart's brand image ("Save money. Live better.") and its related commitment to "making a difference on the issues that matter to our customers and shareholders in the environmental, social and governance (ESG) areas."[3]

Beyond question Board oversight respecting the sale of products especially dangerous to the communities Wal-Mart serves is a matter of public concern. So too is Board oversight of products that pose special risk to Wal-Mart's reputation or brand identity. William Henry Vanderbilt denied ever having responded to a reporter's question with the phrase famously attributed to him, "Let the public be

---

[3] *See* Wal-Mart, *Environmental, Social and Governance Updates for Investors,* Wal-Mart Corporate Webpage, *available at* http://stock.walmart.com/esg-investors (last visited Feb. 4, 2015).

damned!" Were a company to in fact pursue that approach, the risk that the company would damage the public is great. Wal-Mart seeks to be perceived and to have its brand perceived in exactly the opposite way. Board oversight of making that objective a reality is both a matter of public concern and, due to the business importance of reputation and brand identity, also a matter directly connected to long-term shareholder value.

Wal-Mart's fall-back argument is that the Proposal is excludable as "hopelessly vague and indefinite" under Rule 14a-8(i)(3), 17 C.F.R. § 240.14a-8(i)(3). OB 7. Yet the supposedly vague words (*e.g.*, "family and community values integral to the Company's promotion of its brand") are quite familiar to Wal-Mart. They are the very values Wal-Mart desires its brand to stand for. Wal-Mart is keenly devoted to brand management, builds policies around the importance of family and community, and has had numerous occasions in recent decades to evaluate whether the sale of a product endangers its brand. Stockholders voting on the Proposal, and directors and managers implementing the Proposal, would understand what it means to oversee the formulation and implementation of policies about whether to sell the covered categories of products. Rule 14a-8(i)(3) requires nothing more.

8

## STATEMENT OF JURISDICTION

The jurisdiction of this Court and of the District Court is undisputed.  In its Verified Amended Complaint (the "Amended Complaint"), Trinity sought from the District Court declarations that: (1) Wal-Mart's exclusion of Trinity's Proposal from Wal-Mart's 2014 proxy materials violated Section 14(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. 78a, and Rule 14a-8, and (2) Wal-Mart's reasonably anticipated exclusion of the Proposal from its 2015 proxy materials will violate Section 14(a) of the 1934 Act and Rule 14a-8.  (A-245 to A-256).  The District Court rejected Wal-Mart's contention that Count I was moot, correctly holding that Trinity's claim was capable of repetition yet evading review.  (A-16, A-27).  Further, Wal-Mart concedes on appeal that as a result of Trinity's resubmission of its Proposal for inclusion in Wal-Mart's 2015 proxy materials, Count II of Trinity's Amended Complaint is now ripe.  OB 9-10.  Accordingly, the District Court properly exercised subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

On December 8, 2014, the District Court entered final judgment declaring that Wal-Mart improperly excluded Trinity's Proposal from Wal-Mart's 2014 proxy materials, and permanently enjoining Wal-Mart from excluding the Proposal from its 2015 proxy materials.  (A-31).  Wal-Mart filed its notice of appeal on

9

December 16, 2014.  (A-1).  The Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Did the District Court correctly hold that the Proposal may not be excluded from Wal-Mart's proxy materials under Rule 14a-8(i)(7), because the Proposal does not deal with a matter relating to the Company's "ordinary business operations"?

2.    Did the District Court correctly hold that even if the Proposal relates to the Company's "ordinary business operations," it may not be excluded from Wal-Mart's proxy materials under Rule 14a-8(i)(7) because the Proposal transcends the day-to-day business matters and raises issues so significant that it would be appropriate for a shareholder vote?

3.    Did the District Court correctly hold that the Proposal may not be excluded from Wal-Mart's proxy materials under Rule 14a-8(i)(3), because it is not so inherently vague or indefinite that neither the stockholders voting on the Proposal, nor the Company in implementing the Proposal, would be able to determine with any reasonable certainty what actions or measures the Proposal requires?

## STATEMENT OF NO RELATED CASES OR PROCEEDINGS

This case has not been before this Court previously, and Trinity is not aware of any other case or proceeding that is related, completed, pending, or about to be

presented before this Court or any other court or agency, state or federal.  On

January 30, 2015, Wal-Mart notified the Division that it would exclude Trinity's

proposal if it prevailed in this Court.  Wal-Mart did not request no-action or other

relief.

## STATEMENT OF FACTS

### I.    Wal-Mart's Corporate Ethic and Merchandising Practices

Wal-Mart is the world's largest retailer, with nearly 11,000 retail units

internationally.  (A-250 ¶ 2) (Decl. of Geoffrey W. Edwards).  Its stated corporate

ethic is to help people "save money" and to "live better."  The Company's stated

values are "integrity, opportunity, family and community, purpose and

responsibility."[4]

Wal-Mart recognizes that due to its size and mission, it has "an opportunity

and a responsibility to make a difference on the big issues that matter to us all,"[5]

and "is committed to making a difference on the issues that matter to . . .

---

[4] Wal-Mart, *Wal-Mart's 2014 Global Responsibility Report* (2014), Wal-Mart
Corporate Webpage, *available at* http://cdn.corporate.walmart.com/db/e1
/b551a9db42 fd99 ea24141f76065f/2014-global-responsibility-report.pdf (last
visited Feb. 4, 2015).

[5] Wal-Mart, *Global Responsibility*, Wal-Mart Corporate Webpage, *available at*
http://corporate.walmart.com/global-responsibility (last visited Feb. 4, 2015).

shareholders in the environmental, social and governance (ESG) areas."[6]

Company-wide merchandising practices recognize that the sale of certain products presents an unacceptable risk of societal harm and/or reputational and brand identity damage. For example, the Company does not sell adult-rated movie titles (*i.e.*, those rated NC-17), video, or computer software games. Wal-Mart also does not sell to children under 17 either "R" rated movies or "Mature" rated video games.[7] Wal-Mart has had in place a policy not to sell music bearing a "Parental Advisory Label" (A-260) (Wal-Mart's Music Content Policy – Parental Advisory Labels), which may contain strong language or depictions of violence, sex, or substance abuse, since the creation of such labels amid considerable controversy in 1985.[8]

---

[6] *See* Wal-Mart, *Environmental, Social and Governance Updates for Investors*, *supra* note 3.

[7] Wal-Mart, *Mature Merchandise: Music, Video Games and Movies*, Wal-Mart Corporate Webpage, *available at* http://news.walmart.com/news-archive/2008/04/29/mature-merchandise-music-video-games-movies (last visited Feb. 4, 2015).

[8] Tom Cole, *You Ask, We Answer: 'Parental Advisory' Labels – The Criteria and the History*, The Record: NPR (Oct. 29, 2010), http://www.npr.org/blogs/therecord/2010/10/29/130905176/you-ask-we-answer-parental-advisory---why-when-how; Neil Strauss, *Wal-Mart's CD Standards Are Changing Pop Music*, The New York Times (Nov. 12, 1996), http://www.nytimes.com/1996/11/12/arts/wal-mart-s-cd-standards-are-changing-pop-music.html.

Wal-Mart's merchandising practices respecting guns generally have changed over time. In 2006, Wal-Mart stopped selling firearms at approximately 1,000 stores, citing lack of demand in those stores at a time when Wal-Mart was seeking growth by moving into urban and suburban markets.[9] In 2011, after an extended period of declining domestic same-store sales, Wal-Mart announced that it would make firearms available for sale at about half of its 4,000 stores, especially in areas where hunting and fishing are popular activities.[10]

Wal-Mart's current practices respecting guns include not selling handguns in the continental United States, not selling high capacity magazines separately from a gun, not allowing firearms to be ordered online (but advertising them online as available only in stores), and limiting the sale of rifles equipped with high capacity magazines to approximately one-third of Wal-Mart's stores, primarily in locations where there are large concentrations of hunters and sportsmen.[11] These rifles are commonly called assault rifles but are referred to by Wal-Mart as modern sporting

---

[9] *Wal-Mart Will Stop Selling Guns in a Third of Its U.S. Stores*, The New York Times (Apr. 15, 2006), http://www.nytimes.com/2006/04/15/business/15walmart.html?_r=0.

[10] Parija Kavilanz, *Wal-Mart brings guns back*, CNN.com (Apr. 28, 2011), http://money.cnn.com/2011/04/28/news/companies/walmart_guns/#; Josh Sanburn, *Walmart's On-Again, Off-Again Relationship with Guns*, Time.com (Jan. 11, 2013), http://business.time.com/2013/01/11/walmarts-on-again-off-again-relationship-with-guns/print/.t.

[11] Sanburn, *supra* note 10.

13

rifles. Wal-Mart recognizes the special danger of these weapons by requiring that firearms be delivered to the customer by the salesperson after the customer has left the store.

With respect to guns equipped with high capacity magazines, after the mass killing at Sandy Hook Elementary School in 2012, Wal-Mart temporarily removed certain models of assault rifles from its website, but reaffirmed that it would continue to sell assault rifles at approximately 1,200 of its 3,800 stores in the United States, and reportedly sold out of semiautomatic rifles.[12] Wal-Mart's position stood in marked contrast to its competitor Dick's Sporting Goods Inc., which suspended its sale of assault rifles at its more than 500 stores.[13]

Much public attention focused on the sale of assault rifles by Wal-Mart, the country's largest gun retailer.[14] After initially declining to do so, Wal-Mart

---

[12] Matt Townsend, *Guns Sold Out at Wal-Mart as Ammo-Magazine Sales Surge*, Bloomberg News (Dec. 19, 2012), http://www.bloomberg.com/news/articles/2012-12-19/guns-sold-out-at-wal-mart-as-ammo-surge-on-e-bay; Sanburn, *supra* note 10.

[13] Townsend, *supra* note 12.

[14] *See* Gary Stoller, *Protesters Ask Walmart To Stop Selling Assault Weapons*, USA TODAY (Jan. 15, 2013), http://www.usatoday.com/story/news/nation/2013/01/15/newtown-school-shooting-walmart/1836261; George Zornick, *How Walmart Helped Make the Newtown Shooter's AR-15 the Most Popular Assault Weapon in America*, The Nation (Jan. 7-14, 2013), http://www.thenation.com/article/171808/how-walmart-helped-make-newtown-shooters-ar-15-most-popular-assault-weapon-america#.

14

attended talks about gun legislation at the White House.[15]  Wal-Mart stated that it

"had discussed gun sales with the Obama administration, Congress, Bloomberg's

office and sportsmen's groups" and "remain[ed] committed to listening and

sharing our experience[.]"  Stoller, *supra* note 14.

In the course of discussions with Trinity prior to the filing of this lawsuit,

Wal-Mart could not explain why it had decided not to sell handguns or high

capacity magazines as a separate accessory but is willing to sell rifles equipped

with such high capacity magazines.  (A-248 ¶ 8) (Decl. of James H. Cooper).

Based on these exchanges, Trinity concluded that, "Wal-Mart does not appear to

have any policies governing these decisions or providing for transparent board

oversight of their implementation."  *Id.*

## II.    Genesis of the Proposal

Trinity Wall Street is an Episcopal parish located at Broadway and Wall

Street in New York City, New York.  Established in 1697, Trinity conducts worship,

faith formation, and public service activities.  Trinity Church stands at the top of

Wall Street, and its St. Paul's Chapel (where George Washington worshipped after

his inauguration as the nation's first President) is the oldest public building in

---

[15] Abram Brown, "UPDATE: Wal-Mart Changes Its Mind And Will Indeed Attend White House Gun Summit," Forbes.com (Jan. 9, 2013), http://www.forbes.com/sites/abrambrown/2013/01/09/wal-mart-nations-largest-gun-retailer-will-skip-white-house-talks-on-gun-laws.

continuous use in New York City.  In 1705, Queen Anne gave Trinity her farm in

lower Manhattan, positioning Trinity among the best-endowed churches.  This

allows Trinity to pursue a mission of good works beyond the reach of other

religious institutions.

 One of those missions is reducing violence in society.  In light of this

mission, Trinity is deeply concerned by the recent proliferation of mass killings

and the way in which the use of guns with high capacity magazines has

contributed to those killings.  The use of such weaponry to inflict the

unspeakable toll at Sandy Hook Elementary School has caused Trinity to look to

the activities of companies in which it owns stock.

Trinity is a longstanding shareholder of Wal-Mart and shares in Wal-Mart's

stated objective of creating positive change through addressing societal issues that

are important to the communities impacted by its services.  After learning not only

of Wal-Mart's continued sale of assault-type rifles equipped with high capacity

magazines after the Sandy Hook massacre, but also of Wal-Mart's apparent lack of

written policies and Board oversight concerning its approach to products that could

have momentous consequences for both society and corporate reputation and brand

value, Trinity determined it appropriate to begin a dialogue with Wal-Mart in the

hope that Wal-Mart would take steps to improve its corporate governance policies.

(A-248 ¶ 8) (Decl. of James H. Cooper).  Unfortunately, and as described above,

Wal-Mart was unable to explain its strikingly inconsistent approach to products that are especially dangerous or pose significant risks to Wal-Mart's reputation. Trinity's exchanges with Wal-Mart – including with regard to Wal-Mart's unexplained decision not to sell music whose lyrics depict violence, but continue to sell guns with high capacity magazines that undeniably could be used as the instruments of such violence – made clear that Wal-Mart lacks policies to govern these decisions and provide for transparent Board oversight over their implementation. Nevertheless, after several months of correspondence Wal-Mart refused to make any corporate governance improvements.

Trinity therefore elected to exercise its shareholder rights under Section 14(a) of the 1934 Act and Rule 14a-8, and submitted to Wal-Mart on December 18, 2013, the Proposal for inclusion in Wal-Mart's 2014 proxy materials. The Proposal reads in full as follows:

> RESOLVED:
>
> Stockholders request that the Board amend the Compensation, Nominating and Governance Committee charter (or add an equivalent provision to another Board committee charter) as follows:
>
> "27. Providing oversight concerning the formulation and implementation of, and the public reporting of the formulation and implementation of, policies and standards that determine whether or not the Company should sell a product that:
>
> 1) especially endangers public safety and well-being;
>
> 2) has the substantial potential to impair the reputation of the Company; and/or

3) would reasonably be considered by many offensive to the family and community values integral to the Company's promotion of its brand."

This oversight and reporting is intended to cover policies and standards that would be applicable to determining whether or not the company should sell guns equipped with magazines holding more than ten rounds of ammunition ("high capacity magazines") and to balancing the benefits of selling such guns against the risks that these sales pose to the public and to the Company's reputation and brand value.

The Proposal's Supporting Statement for the addition of this 27th item to the 26 governance-related items already in the Committee Charter[16] stated that "[w]hile guns equipped with high capacity magazines are just one example of a product whose sale poses significant risks to the public and to the company's reputation and brand, their sale illustrates a lack of reasonable consistency that this proposal seeks to address through Board level oversight.  This responsibility seems appropriate for the Compensation, Nominating and Governance Committee, which is charged with related responsibilities."  As explained by the Reverend James H. Cooper, Trinity's Rector, in an affidavit in support of Trinity's motion for summary judgment, "[t]his approach allows the company to make a transparent choice considering both the business and ethical (community impact) aspects of the matter.  Anti-violence concerns can be broadly considered,

---

[16] The Charter of the Compensation, Nominating, and Governance Committee can be found on Wal-Mart's corporate  website, *available at* http://stock.walmart.com/corporate-governance/compensation-nominating-governance-committee.

including for example the sale of video games glorifying violence, as well as other merchandising decisions that are inconsistent with the well-being of the community and/or Wal-Mart's brand value and desired reputation."  (A-248 ¶ 7).

Three categories of especially dangerous products are covered by the Proposal.  The first category is products that "especially" endanger public safety.  The second category is products especially dangerous to the reputation of the Company by having a "substantial potential" to impair that reputation.  The third category is products that are especially dangerous to the brand value of the Company by being objectively and substantially offensive to the family and community values for which the Company wants its brand to stand.

In this appeal, Wal-Mart and the *amici* supporting it repeatedly rewrite the terms of the Proposal by representing that it covers products subjectively offensive without regard to brand identity, by not mentioning the word "especially" before endanger, and by not mentioning (except for one brief) that the Proposal includes the statement that the sale of guns equipped with high capacity magazines poses risks to the public and to the Company's reputation and brand value.  OB 2, 11; NAM Br. 2, 10; Wash. Legal Found. Br. 3-4.  The brief that does make that mention wrongly attributes this provision of the Proposal to the Supporting Statement.  RLC Br. 2-3.  The *amicus* brief filed by the American Petroleum

Institute, Business Roundtable, and the U.S. Chamber of Commerce takes the expedient route of not describing the Proposal at all.

### III.    Wal-Mart Requests and Obtains a No-Action Letter

On January 30, 2014, Wal-Mart wrote to the Division stating its intention to omit the Proposal from the 2014 Proxy Materials (the "No-Action Request"). *See* 17 C.F.R. § 240.14a-8(j).  It supported this intention on the ground that the Proposal deals with matters relating to Wal-Mart's ordinary business operations. Wal-Mart did not seek exclusion on the ground that the Proposal was impermissibly vague.  On February 4, 2014, Trinity responded to the No-Action Request by explaining that the Proposal did not fall within the narrow exception set forth in Rule 14a-8(i)(7).  (A-279 to A-285).

On March 20, 2014, the Division issued a no-action letter (the "No-Action Letter"), informing Wal-Mart that there was "some basis" for it excluding the Proposal under Rule 14a-8(i)(7).  In conclusory fashion, the Division stated that the Proposal related to "products and services offered for sale" by Wal-Mart.  It further noted that, "[p]roposals concerning the sale of particular products and services [are] generally excludable under rule 14a-8(i)(7)." *Id.*  Thus, the Division would not recommend enforcement action if Wal-Mart omitted the Proposal from its 2014 Proxy Materials.  The Division did not discuss the Proposal's corporate governance and community safety focus – characteristics

20

that do not involve ordinary business and in any event transcend a company's

ordinary business operations.

## IV.    Trinity Commences Suit

Trinity followed SEC guidance regarding resort to judicial authority[17] and

on April 1, 2014, commenced this action.  In its Complaint, Trinity sought a

declaratory judgment that Wal-Mart's decision to omit the Proposal from the 2014

Proxy Materials violated Section 14(a) of the 1934 Act and Rule 14a-8.  The

Complaint also sought injunctive relief compelling Wal-Mart to include the

Proposal in the 2014 Proxy Materials.  Because of the short, 34-day period

between the Division's issuance of the No-Action Letter on March 20, 2014, and

Wal-Mart mailing the 2014 Proxy Materials to shareholders on April 23, 2014,

Trinity also moved for a temporary restraining order and preliminary injunctive

relief.

On April 11, 2014, the District Court held oral argument on, and denied,

Trinity's motion.  The District Court determined that Trinity had not shown a

likelihood of success on the merits necessary to obtain the extraordinary injunctive

---

[17] As explained in greater detail below, *see infra* at 29, the Division has instructed:
"Only a court such as a U.S. District Court can decide whether a company is
obligated to include shareholder proposals in its proxy materials."  SEC Division
of Corporation Finance, *Informal Procedures Regarding Shareholder Proposals*,
SEC, *available at* http://www.sec.gov/divisions/corpfin/cf-noaction/14a-8-
informal-procedures.htm (last modified Nov. 2, 2011).

relief it had requested. (A-108 to A-112). In reaching this conclusion, the District Court emphasized the time constraints under which it was required to resolve the motion, and observed that "if the case proceeds, I'll at least have more time to reflect further on the argument." (A-111).

Over the subsequent seven months, the District Court continued to deliberate on Wal-Mart's exclusion of the Proposal with the help of five additional briefs on the merits, three briefs on the justiciability of the controversy, oral argument, and supplemental briefing. (A-24) (noting that in light of a mere ten days between Trinity's filing of its motion and oral argument, the District Court's analysis was "necessarily truncated," but that the District Court's subsequent memorandum reflected additional reflection and invaluable briefing and argument).

On November 26, 2014, the District Court issued a Memorandum Opinion and Order declaring that Wal-Mart had wrongfully excluded the Proposal from its 2014 proxy materials, and enjoining Wal-Mart from excluding the Proposal from its 2015 proxy materials. (A-2 to A-28). The District Court relied on SEC guidance to conclude that the Proposal "is best viewed as dealing with matters that are not related to Wal-Mart's ordinary business operations," and rejected Wal-Mart's contention that the Proposal is excludable under Rule 14a-8(i)(3) because it is "so inherently vague and indefinite." (A-19 to A-25).

In concluding that the Proposal does not fall within the ordinary business operations exception, the District Court correctly recognized that the Proposal does not dictate to management "specific products that Wal-Mart could or could not sell," but rather requests through Board oversight improved corporate governance over "the development and effectuation of a Wal-Mart policy."  (A-19 to A-20). The District Court explained that its conclusion is "strongly support[ed]" by SEC guidance, as the Proposal does not address matters "'so fundamental to management's ability to run a company on a day-to-day basis'" that it would be impractical to permit "'direct shareholder review.'"  (A-20) (quoting 1998 Adopting Release).

Next, the District Court held that to the extent the Proposal relates to products Wal-Mart may sell, it nonetheless transcends Wal-Mart's day-to-day business matters and raises policy issues that are appropriate for shareholder consideration.  "The significant social policy issues on which the Proposal focuses include the social and community effects of sales of high capacity firearms at the world's largest retailer and the impact this could have on Wal-Mart's reputation, particularly if such a product sold at Wal-Mart is misused and people are injured or killed as a result."  (A-21).

In reaching these conclusions, the District Court made clear that it had reviewed the "many" no-action letters written by staff of the Division that Wal-

23

Mart had argued supported its position.  The District Court rightly concluded that "[n]one of the letters cited by Wal-Mart involved proposals comparable to Trinity's."  (A-22).

Finally, the District Court rejected Wal-Mart's contention that the Proposal may be excluded as "so inherently vague or indefinite."  (A-24 to A-26).  Instead, the District Court observed that the Proposal properly leaves the details of policy formulation and implementation to the discretion of the Board, and concluded that neither Wal-Mart's stockholders nor the Board would have any problem in determining with reasonable certainty what action the Proposal requests.  (A-25).  In so holding, the District Court again took note of no-action letters issued by the Division staff, observing that they supported inclusion, not exclusion, of the Proposal.

Wal-Mart filed its notice of appeal on December 16, 2014.  (A-1).  On December 18, 2014, Trinity submitted its Proposal for inclusion in Wal-Mart's 2015 proxy materials.  The Court granted Wal-Mart's unopposed motion to expedite its appeal on December 29, 2014.  On January 30, 2015, Wal-Mart wrote to the Division that it intended to exclude the proposal if it prevailed in this Court.

## SUMMARY OF ARGUMENT

The District Court's determination that the Proposal may not be excluded under Rule 14a-8 is correct in all respects, and should be affirmed.

24

*First*, the District Court correctly held that the Proposal does not fall within Wal-Mart's ordinary business operations. As relevant here, the ordinary business operations exception ensures that shareholders do not become involved in the mundane, day-to-day business activities of a corporation, because it would be impracticable for shareholders to do so. As Trinity argued below and the District Court concurred, the Proposal does not relate to ordinary business because it is a governance proposal to amend the charter of a Board committee, and this action is not ordinary or relating to day-to-day operations but a request to ensure Board oversight at the policy level.

*Second*, even if seen as ordinary business, it falls within the exception for a proposal that raises a "policy issue[] so significant that it would be appropriate for a shareholder vote." 1998 Adopting Release, 1998 WL 254809, at *4. The policy issue Trinity presents is whether a mass market retailer such as Wal-Mart should meet customer demand for products like guns equipped with high capacity magazines that are especially dangerous to the reputation, brand value of the Company, and/or the safety of the community it seeks to serve. As described by the District Court, this policy issue is significant because of the significant adverse corporate and public risks that the sale of such especially dangerous products entails.

*Third*, the Proposal may not be excluded as "so inherently vague or indefinite."   The Proposal's purpose is clear on its face.  Moreover, the "family and community values" that the Proposal requests the Board to consider are those for which the Company desires its brand to stand for and are thus the same family and community values that Wal-Mart holds itself out as embodying.  Neither Wal-Mart's Board nor its shareholders will therefore have any difficulty in understanding the actions or measures that the Proposal calls for.

## STANDARD OF REVIEW

The Court reviews the District Court's order granting summary judgment *de novo*, applying the same standard used by the District Court.  *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000).  Below, Wal-Mart bore the burden of establishing as a matter of law that it properly excluded the Proposal under an exception to Rule 14a-8.  *See Am. Fed'n of State, Cnty. & Mun. Emps. v. Am. Int'l Grp., Inc.*, 462 F.3d 121, 125 (2d Cir. 2006).

## ARGUMENT

### THE DISTRICT COURT CORRECTLY HELD THAT THE PROPOSAL MAY NOT BE EXCLUDED UNDER RULE 14a-8

### I.     Regulatory Framework

This case concerns the interpretation of Rule 14a-8, 17 C.F.R. § 240.14a-8.  The SEC adopted the predecessor to Rule 14a-8 in 1942, *see* 7 Fed. Reg. 10,659 (1942), pursuant to Section 14(a) of the 1934 Act, 15 U.S.C. § 78n, which

26

empowers the SEC to regulate the solicitation of proxies for the "public interest or protection of investors."

Section 14 "stemmed from the congressional belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'" *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) (quoting H.R. Rep. No. 73-1383, at 13). "[S]ection 14a['s] overriding purpose is to assure corporate shareholders the ability to exercise their right – some would say their duty – to control the important decisions which affect them in their capacity as stockholders and owners of the corporation." *Med. Comm. for Human Rights v. S.E.C.,* 432 F.2d 659, 680-81 (D.C. Cir. 1970); *see also* Press Release, SEC, *SEC to Hold Roundtable on Proxy Voting*, (Jan. 27, 2015) *available at* http://www.sec.gov/news/pressrelease/2015-15.html#.VMjXRvkRAjI ("The ability to vote allows investors to make their views known to the company's management and to participate effectively at annual or special meetings.").

Rule 14a-8, which is cast in a question and answer format to promote user friendliness, provides a cost-effective means for stockholders to communicate. Each year before an annual meeting, public companies such as Wal-Mart send materials to solicit proxies from the many shareholders who will not attend the meeting in person to vote for the election of directors and on other proposals. (A-123 to A-218) (Wal-Mart's 2014 Proxy Statement). Rule 14a-8 provides security

27

holders with "a right to have their proposals presented to the issuer's security

holders at large and to have proxies with respect to such proposals solicited at little

or no expense to the security holders." *See* Proposed Amendments to Rule 14a-8,

Exchange Act Release No. 19,135, 1982 WL 600869, at *2 (Oct. 14, 1982) ("1982

Release"). Its purpose is to give shareholders "[a]ccess to management proxy

solicitations, to sound out management views and to communicate with other

shareholders on matters of major import." *Roosevelt v. E.I. DuPont de Nemours &*

*Co.*, 958 F.2d 416, 421 (2d Cir. 1992).

Because "a shareholder may present a proposal at the annual meeting

regardless of whether the proposal is included in a proxy solicitation, the corporate

circulation of proxy materials which fail to make reference to a shareholder's

intention to present a proper proposal at the annual meeting renders the solicitation

inherently misleading." *N.Y.C. Emps.' Ret. Sys. v. Am. Brands, Inc.*, 634 F. Supp.

1382, 1386 (S.D.N.Y. 1986).

Rule 14a-8 broadly supports the inclusion of shareholder proposals in a

company's proxy materials. A company "must include" a proposal from an

eligible shareholder in the company's proxy materials, unless the company proves

that it is entitled to exclude a proposal under a specific exception. 17 C.F.R. §

240.14a-8(g). "[T]he burden is on the company to demonstrate that it is entitled to

exclude a proposal." *Id; see also Am. Fed'n of State, County & Mun. Emps.*, 462

F.3d at 125 ("A company must include [a] proposal . . . unless the corporation can prove . . . that a given proposal may be excluded based on one of thirteen grounds enumerated in the regulations.").

Rule 14a-8 has been interpreted by courts, by the commissioners of the SEC in interpretive releases, and by the staff of the Division in staff legal bulletins and by staff members in individual "no-action" letters. There is an interpretive hierarchy to these pronouncements.

Only courts can provide definitive interpretations of Rule 14a-8, and the SEC so recognizes. *See Roosevelt*, 958 F.2d at 424 ("The Commission has consistently regarded the court, and not the agency, as the formal and binding adjudicator of Rule 14a-8's implementation of section 14(a)."); SEC Division of Corporation Finance, *Informal Procedures Regarding Shareholder Proposals*, SEC, *available at* http://www.sec.gov/divisions/corpfin/cf-noaction/14a-8-informal-procedures.htm (last modified Nov. 2, 2011) (stating that "[o]nly a court such as a U.S. District Court can decide whether a company is obligated to include shareholder proposals in its proxy materials").

In SEC interpretive releases, the commissioners of the SEC publish their collective views on SEC regulations. *See* SEC Interpretive Releases, www.sec.gov/rules/interp.shtml. "Together, SEC rules, SEC orders, and SEC releases comprise what can be characterized as the official and formal side of the

29

SEC's spectrum of interpretive authority."  Donna M. Nagy, *Judicial Reliance on Regulatory Interpretations in SEC No-Action Letters: Current Problems and a Proposed Framework*, 83 Cornell L. Rev. 921, 933 (1998).  This Court "defer[s] to the SEC's reasonable" interpretation of regulations when set forth in an SEC release.  *Morrison v. Madison Dearborn*, 463 F.3d 312, 315 (3d Cir. 2006); *see also Apache Corp. v. N.Y.C. Emps. Ret. Sys.*, 621 F. Supp. 2d 444, 451 (S.D. Tex. 2008) ("A clear reading of the 1998 Release informs this court's analysis."); *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.*, 821 F. Supp. 877, 892 (S.D.N.Y. 1993) (holding "courts must defer to" an operative SEC release).  Here, the District Court discussed how the 1998 Adopting Release "strongly supports the Court's conclusions."  (A-20).

Less authoritative are "staff legal bulletins," a relatively recent vehicle by which the Division dispenses informal advice to the public on a variety of interpretive issues.  Nagy, *supra*, 83 Cornell L. Rev. at 935 n.52.  "A bulletin is expressly labeled as 'views of the staff,' and specifies that it is 'not a rule, regulation or statement of the Securities and Exchange Commission[.]'"  *Id.* (quoting Staff Legal Bulletin No. 1 (CF), 1997 WL 34684189, at *1 (Feb. 28, 1997)).

When companies decide to omit a shareholder proposal, they frequently seek a no-action letter from the Division staff in support of their decision.  Each year the

30

Division is tasked with reviewing hundreds of requests for no-action letters, the

bulk of which require an answer between December and March. *See*

*Amalgamated*, 821 F. Supp. at 885. The no-action letters written in response

indicate whether the Division will or will not recommend enforcement action if the

proposal is omitted. If the staff decides it will not recommend enforcement, the

letter typically includes the statement that there is "some basis" for the Company's

decision to omit. (A-302 ¶ 9) (Decl. of Meredith B. Cross).

These letters reflect the Division staff member's "informal views regarding

the application of Rule 14a-8," and its "determinations do not and cannot

adjudicate the merits of a company's position with respect to a proposal." Staff

Legal Bulletin No. 14 (CF), 2001 WL 34886112, at *5 (July 13, 2001). "[S]ince

no-action letters are informal, they receive even less deference than other

interpretive rules." *N.Y.C. Emps.' Ret. Sys. v. SEC*, 45 F.3d 7, 14 (2d Cir. 1995).

"SEC no-action letters constitute neither agency rule-making nor adjudication and

thus are entitled to no deference beyond whatever persuasive value they might

have." *Gryl ex rel. Shire Pharms. Grp. PLC v. Shire Pharms. Grp. PLC,* 298 F.3d

136, 145 (2d Cir. 2002). The level of deference, if any, "owed to any particular

interpretation depends upon 'the thoroughness evident in its consideration, the

validity of its reasoning, its consistency with earlier and later pronouncements and

all those factors which give it power to persuade.'" *In re New Times Secs. Servs.,*

31

*Inc.*, 371 F.3d 68, 83 (2d Cir. 2004) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)).

No-action letters that contain only a cursory analysis need not be deemed persuasive. *Ret. Bd. of Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of New York Mellon*, No. 11 Civ. 5459(WHP), 2013 WL 593766, at *3 (S.D.N.Y. Feb. 14, 2013) ("[C]ursory agency pronouncements on which BNYM and its *amici* rely lack persuasive power"). Even when a no-action letter contains reasoning, courts will not defer to the staff's position if it "sharply deviates from the standard articulated in" an SEC release. *Amalgamated*, 821 F. Supp. at 890.

A court must, as Chief Judge Stark did, "independently analyze the merits of a dispute." *Apache Corp.*, 621 F. Supp. 2d at 449. Other district courts have similarly enjoined proxy solicitations that omitted shareholder proposals despite the Division staff having issued no-action letters recommending against enforcement. *See Amalgamated*, 821 F. Supp. at 892; *N.Y.C. Emps' Ret. Sys. v. Dole Food Co.*, 795 F. Supp. 95, 99 (S.D.N.Y, 1992); *N.Y.C. Emps.' Ret. Sys. v. Am. Brands, Inc.*, 634 F. Supp. 1382, 1386 (S.D.N.Y. 1986); *Lovenheim v. Iroquois Brands, Ltd.*, 618 F. Supp. 554, 560 n.14, 561 (D.D.C. 1985).

## II.    The Proposal Does Not Fall Within the "Ordinary Business Operations" Exception

Wal-Mart's principal argument below and on appeal is that it properly excluded the Proposal under the "ordinary business operations" exception. That

32

exception is set forth in Rule 14a-8(i)(7), which states: "Management functions: [the proposal may be excluded if] the proposal deals with a matter relating to the company's ordinary business operations." 17 C.F.R. § 240.14a-8(i)(7). Under the wording of the exception, as well as the meaning given to it by both the courts and the SEC, the Proposal does not concern Wal-Mart's ordinary business operations. Instead, the Proposal addresses shortcomings in Wal-Mart's corporate governance and oversight over significant policy matters, and thus may not be excluded under Rule 14a-8(i)(7).

The interpretation of any statute or rule begins with an examination of the rule's language. *See Register v. PNC Fin. Servs. Grp. Inc.*, 477 F.3d 56, 67 (3d Cir. 2007). Here, "management functions" and "ordinary business operations," when read together, have a plain meaning in common English, *i.e.*, the everyday activities of a company typically carried out by management. *See* Webster's Third New Int'l Dict. 1589 (1993) (defining "ordinary" as "occurring or encountered in the usual course of events: not uncommon or exceptional: not remarkable: ROUTINE: NORMAL.") (capitalization in original). "Relating to," in turn, is best read narrowly as meaning "concerning, pertaining to, about" and not broadly, as it might be in a broad arbitration clause or a general release, as "having some direct or indirect connection with." *See* Black's Law Dict. 1288 (6th ed. 1990) (defining "relate" as "to stand in some relation to: to have bearing or concern; to pertain;

33

refer; to bring into association with or connection with."). As Chief Judge Stark correctly explained, the more expansive reading of "relating to" would make the exception the rule, as anything a company does could at some level touch upon routine business matters. (A-20 to 21). Under this construction of "ordinary business" and "relating to," the Proposal is fairly and best seen as one about governance of decisions to sell products especially dangerous to the community or the Company, and not about ordinary day-to-day merchandising decisions.

This plain reading of the ordinary business operations exception accords with the meaning given to it by both the Courts of Appeals and the SEC. As the D.C. Circuit has explained, the term "management function," like the phrase "ordinary business operations," does not have a "precise definition,"[18] but "only those proposals involving 'business matters that are mundane in nature and do not involve any substantial policy' considerations may be omitted under exemption 7." *Grimes v. Centerior Energy Corp.*, 909 F.2d 529, 531-32 (D.C. Cir. 1990) (citing Adoption of Amendments Relating to Proposals by Security Holders, 41 Fed. Reg. 52,994, 52,998 (Dec. 3, 1976) ("1976 Amendments")).

Similarly, when the SEC last addressed the ordinary business operations exception in 1998, it explained that the exception rests on two considerations,

---

[18] *See also* 1998 Adopting Release, 1998 WL 254809, at *4 ("[T]here is no bright-line test to determine when employment-related shareholder proposals raising social issues fall within the scope of the 'ordinary business' exclusion").

34

neither of which apply here. First, a proposal whose subject matter is "so fundamental to management's ability to run a company on a day-to-day basis that [it] could not, as a practical matter, be subject to direct shareholder oversight," may fall within the exclusion. 1998 Adopting Release, 1998 WL 254809, at *4. Examples of such everyday matters include "production quality and quantity," the "retention of suppliers," or "management of the workforce." *Id.* However, even if a proposal relates to such matters, a company nonetheless may not exclude the proposal if it "focus[es] on sufficiently significant social policy issues . . . , because the proposal[] would transcend the day-to-day business matters," and thus be the proper subject of shareholder vote. *Id.* (reversing exclusion of employment-related proposals involving social issues because they have engendered "widespread public debate"); 1976 Amendments at 52998 (ordinary business matters must be both mundane *and* not involve any substantial policy).

"The second consideration relate[s] to the degree to which the proposal seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders, as a group, would not be in a position to make an informed judgment." 1998 Adopting Release, 1998 WL 254809, at *5. Proposals of course "may seek a reasonable level of detail without running afoul of these considerations," and even those proposals that seek to impose time-frames or

35

methods may not be excluded when they concern significant policy issues.  *Id.* at *4.

These examples make clear that the purpose of the ordinary business exclusion is to restrict "the resolution of ordinary business problems to management and the board of directors" because it would be "impracticable" for shareholders to resolve these problems at the annual meeting.  *Id.*

Subsequent statements of the Division (not the SEC itself) further confirmed the significance, and thus non-excludability, of proposals that address larger policy issues that transcend any connection to a company's ordinary business.  First, in 2005, the Division wrote that shareholder proposals addressing risks to public health or the environment do not constitute an ordinary business concern:

> To the extent that a proposal and supporting statement
> focus on the company minimizing or eliminating
> operations that may adversely affect the environment or
> the public's health, we do not concur with the company's
> view that there is a basis for it to exclude the proposal
> under rule 14a-8(i)(7).

Staff Legal Bulletin No. 14C (CF), 2005 WL 6767321, at *5 (June 28, 2005).

Likewise, in 2009, the Division recognized that the role of a company's board in assessing risk was critical to a company's governance and transcended ordinary business:  "[W]e note that there is widespread recognition that the board's role in the oversight of a company's management of risk is a significant policy matter

regarding the governance of the corporation."  Staff Legal Bulletin No. 14E (CF),

2009 WL 4363205, at *2 (Oct. 27, 2009).

### A.    The Proposal Does Not Concern Wal-Mart's Ordinary Business

Considered against the exception's plain language, the case law, and the

interpretation of the SEC, the District Court properly found that the Proposal does

not relate to Wal-Mart's ordinary business operations.  (A-19).  As an initial

matter, Wal-Mart concedes, as it did before the District Court and the Division

staff, that the Proposal does not fall under the latter, "micromanagement"

consideration identified in the SEC's 1998 Adopting Release.  OB 22 & n.4.

Likewise, the Proposal does not deal with the "minutiae of [Wal-Mart's] daily

business decisions" *Grimes*, 909 F.2d at 532, nor seek to supplant management's

routine business decision-making, 1998 Adopting Release, 1998 WL 254809 at *4.

Instead, the Proposal calls for an improvement in Wal-Mart's corporate

governance by requesting that the Board provide oversight over Wal-Mart's

policies concerning the sale of products that pose a substantial danger to the

Company and the communities it serves.  Asking the Board to evaluate such a

high-level policy issue is a proper shareholder proposal that does not infringe upon

the day-to-day management of the Company and is not impracticable for

shareholders to consider.

Underlying Wal-Mart's position – both on appeal and below – is the flawed assumption that the Proposal's focus is Wal-Mart's general discretion as to product selection, a discretion involving a myriad of products. *See, e.g.*, OB 25, 28-29. This reductionist view ignores that the Proposal's subject matter is improved corporate governance over whether to sell especially dangerous products of substantial significance to Wal-Mart's reputation, brand and/or public safety. The Proposal does not try to "solve" a problem concerning Wal-Mart's sales, but rather seeks to fill a gap in oversight such that the Board – not Trinity or any other shareholder – can determine whether a problem exists.

The Proposal does *not* request that Wal-Mart cease selling any particular product or class of products. It is not a "stop selling" proposal. Nor does it require intricate reports on Wal-Mart's products. And although the Proposal, if adopted, would guide decisions with respect to the sale of the limited class of especially dangerous products identified by the Board, as the District Court correctly recognized, the ordinary business operations exception is not triggered whenever a proposal can be linked to a company's business, no matter the attenuation. (A-22) ("[A]nything a company like Wal-Mart does at least somewhat 'deals with' a matter 'relating to' the company's business operations."). "Such a broad reading is inconsistent with the guidance provided by the SEC itself . . . and, if adopted, would improperly permit the 'exception to swallow the rule.'" (A-22 to A-23).

Failing to link the Proposal to the ordinary business of selling products, Wal-Mart next attempts to create a straw man by converting the District Court's reasoned decision into "a board action exception to Rule 14a-8(i)(7)." OB 28. However, Trinity has never argued, and the District Court certainly did not hold, that the Proposal falls outside the ordinary business operations exception merely by virtue of the fact that it requests Board action. It is the *nature* of the proposal that controls, and here, the Proposal's focus is the improvement of corporate governance over strategic matters of community responsibility, reputation for good corporate citizenship, and brand reputation, none of which can be considered ordinary business. For this reason, the District Court's decision finds support in each of the earlier SEC Releases to which Wal-Mart cites. *See* OB 24-26 (citing the SEC's 1976, 1982, and 1983 Releases).[19]

---

[19] The SEC's 1976, 1982, and 1983 Releases stand for the proposition that a Proposal does not automatically fall outside the ordinary business operations exception merely because it calls for board action or creates a committee. The question, rather, is what the board or committee is called on to do. Thus, a committee that is to review "the balance between labor and capital intensive production" concerns a company's ordinary business. 1982 Release, 1982 WL 600869, at n.49 (Oct. 14, 1982); *accord* 1998 Adopting Release, 1998 WL 254809, at *4 (noting production quantity or quality or retention of suppliers as an ordinary business activity). By contrast, the Proposal here calls on the Board to consider whether to create policies to better protect Wal-Mart's reputation, brand, and the communities it serves.

Wal-Mart's reliance on Staff Legal Bulletin No. 14E is similarly unavailing. OB 27. The Proposal requests that the Board provide oversight regarding the formulation of policies and standards. This may, or may not, involve a risk evaluation, but that is wholly within the discretion of the Board.

Moreover, even if the Proposal did involve some evaluation of risk, the underlying subject matter of that risk is not Wal-Mart's ordinary business. Wal-Mart's ordinary business risk is exemplified by the "Risk Factors" identified in its Form 10-K, where Wal-Mart explained that it is subject to ordinary business risk based on whether it can "predict consistently and successfully the products and services our customers will demand." (A-299). By contrast, the "risks" addressed in the Proposal are those to society and Wal-Mart should a product, after it is sold, cause harm to Wal-Mart's customers or its brand and reputation.[20]

---

[20] The no-action letters relied on by Wal-Mart support Trinity's position. OB 27, 29. In *Western Union*, the Proposal not only sought the establishment of a risk committee to assess *all* potential material risks to the company, but further required that the committee periodically report to shareholders the company's approach to monitoring and controlling these risks and how they were addressed. *Western Union Co.*, No-Action Letter, 2011 WL 916163, at *1 (Mar. 14, 2011); *see also Sempra Energy*, No-Action Letter, 2011 WL 6425347, at *1 (Jan. 12, 2012) (granting no-action relief where proposal urged board to conduct oversight each year of political, legal and financial risks posed by operations in any country that may pose an elevated risk of corrupt practices and to publish an annual report to shareholders on this review).

In *Pepsi*, by contrast, the Division denied no-action relief, concluding that "the proposal focuses on the significant policy issue of the board's role in the oversight of the company's management of risk and does not seek to micromanage

At bottom, there is a fundamental distinction between a proposal that addresses mundane matters such as production quality or employee benefits, 1998 Adopting Release, 1998 WL 254809, at *4, and one that seeks to ensure that the Board of Directors does its job of providing oversight over a subject directly impacting Wal-Mart's brand, reputation, and commitment to good corporate citizenship.[21]   While the former has been deemed to be impracticable for shareholder involvement, *id.*, the latter is undeniably of sufficient breadth and import to warrant shareholder consideration and involvement.  *See Med. Comm.*, 432 F.2d at 680-81 ("[S]ection 14(a)['s] overriding purpose is to assure to corporate shareholders the ability to exercise their right – some would say their duty – to control the important decisions which affect them in their capacity as stockholders and owners of the corporation."); *accord Roosevelt*, 958 F.2d at 421

---

the company to such a degree that exclusion of the proposal would be appropriate." *PepsiCo, Inc.*, No-Action Letter, 2012 WL 542708, at *1 (Feb. 16, 2012).  Here, the Proposal does not seek a broad risk assessment but asks only for Board oversight over consideration of certain products that pose a threat to Wal-Mart's reputation and its customer's safety and well-being.  Nor does the Proposal by its terms demand a detailed report to shareholders.

[21] Because boards of directors "cannot themselves manage the operations of the firm," they ordinarily satisfy their duty to oversee the business and affairs of a corporation by establishing or approving "the long-term strategic, financial and organizational goals of the corporation," and by supervising "the management of the business and affairs of the corporation."  *Grimes v. Donald*, No. Civ. A. 13358, 1995 WL 54441, at *1 (Del. Ch. Jan. 11, 1995) (Allen, C.), *aff'd*, 673 A.2d 1207 (Del. 1996)

(Rule provides shareholders "[a]ccess to management proxy solicitations to sound out management views and to communicate with other shareholders on matters of major import").

### B.    In Any Event, The Proposal Focuses On Important Policy Matters That Transcend Wal-Mart's Ordinary Business

Wal-Mart acknowledges, as it must, that even those proposals that relate to a company's ordinary business operations may not be excluded if they focus on significant issues of policy.  OB 30.  Indeed, the courts and the SEC have consistently made this clear.  *See supra* at 35-36; *Grimes*, 909 F.2d at 532 (proposal must be "mundane" and "not involve any substantial policy considerations" to be excluded under the ordinary business operations exception); *N.Y.C. Emps. Ret. Sys. v. Dole*, 795 F. Supp. at 100 ("even if the proposal touches on the way daily business matters are conducted, the statement may not be excluded if it involves a significant strategic decision as to those daily business matters").[22]  Thus, in addition to demonstrating that the Proposal concerns Wal-Mart's ordinary business operations, Wal-Mart further must establish that the Proposal does not concern *either* important issues of social policy *or* important issues of corporate policy, and thus does not "transcend" those ordinary business operations.  *Id.* at 100; *see also* 1998 Adopting Release, 1998 WL 254809, at *4 &

---

[22] *Apache* supports this proposition, as the court found in favor of excluding the proposal only because certain portions of the proposal sought "to micromanage the company to an unacceptable degree."  621 F. Supp. 2d at 452.

n.43 (noting as example of transcendent policy issue proposal addressing executive compensation); SEC Staff Legal Bulletin No. 14E (CF), 2009 WL 4363205, at *2 (Oct. 27, 2009) (the "board's role in the oversight of a company's management of risk is a significant corporate policy matter regarding the governance of the corporation"). Wal-Mart has failed to meet that burden.

The Proposal focuses on *both* corporate policy and social policy by addressing Wal-Mart's corporate governance with regard to Board oversight of the sale of products with a substantial impact on community safety, company reputation, and brand identity. In an age of mass shootings, increasing violence, and concerns about product safety, the Proposal goes to the heart of Wal-Mart's impact on and approach to social welfare, as well as the risks such impact and approach may have to Wal-Mart's reputation and brand image and its community. These matters rise above ordinary business because of their substantial importance to both the Company's economic success and in that connection its reputation for good corporate citizenship. Whatever Wal-Mart ultimately decides with regard to merchandise that raises these concerns, Trinity and other shareholders have an interest in knowing that the Board is overseeing the present and future choices the Company makes about products of substantial public and reputational concern, and what policies and standards are used to guide those choices. Providing that assurance is the focus of the Proposal.

The District Court discussed an important example of how the Proposal focuses on matters of transcendent policy, taking note of "the social and community effects of sales of high capacity firearms at the world's largest retailer and the impact this could have on Wal-Mart's reputation, particularly if such a product sold at Wal-Mart is misused and people are injured or killed as a result." (A-21).  While the class of especially dangerous products covered by the Proposal is quite limited, that, of course, is not the only example.  There are various products especially dangerous to reputation, brand value, or the community that a family retailer such as Wal-Mart should carefully consider whether or not to sell, and the Proposal addresses the transcendent policy issue of under what policies and standards and with what Board oversight Wal-Mart handles these merchandising decisions.

Wal-Mart concedes in its opening brief, as it did before the Division, that its sale of assault rifles equipped with high capacity magazines raises a transcendent policy issue.  *See* OB 31.  Wal-Mart nonetheless argues that the Proposal may be excluded because it does not focus on this issue, and that the District Court misunderstood SEC guidance as requiring inclusion of a proposal that merely "implicates" issues of policy.  These arguments lack merit.  The Proposal focuses on Board oversight of the sale of products that are especially dangerous to the

44

public or the Company's brand and reputation, and that focus concerns a significant policy issue on which shareholders can rightly ask to be heard.

As an initial matter, the District Court undeniably understood and applied the standard set forth in the 1998 Adopting Release.  On three separate occasions, the District Court recognized that a proposal must "focus" on a significant policy issue, *see* A-20, A-21 n.9, A-23 n.10, and further correctly concluded that the Proposal "focuses" on "significant social policy issues."  That the District Court supported its conclusion by way of illustrative example of the significant social policy issues "included" in the proposal does not suggest otherwise.  Indeed in the context of the sale of products especially dangerous to the corporate reputation or brand value, the Board's effective oversight and concern is itself a matter of public concern.  A company that is not attentive at the Board level as to how its brand is perceived by the public is a company at great risk of damaging the public and itself.

Wal-Mart cites certain no-action letters in support of its assertion that the Proposal is too broad, OB 31-34, each of which is readily distinguishable because the proposal at issue there implicated ordinary, everyday matters.  For example, in *PetSmart, Inc.*, the proposal addressed "violations of administrative matters such as record keeping" in addition to violations of state and federal law concerning animal abuse.  *PetSmart, Inc.*, No-Action Letter, 2011 WL 528414, at *1 (Mar. 24,

45

2011).  And in *Mattel, Inc.*, the proposal "asked the board to require the company's suppliers to report on their compliance with a third-party code of business practices," OB 32, which in turn compelled compliance with *all* applicable local laws concerning sanitation and risk protection.  *Mattel, Inc.*, No-Action Letter, 2012 WL 483197, at *1-11 (Feb. 10, 2012).[23]  By contrast, the Proposal is much narrower and focused and limited to requesting Board oversight over Wal-Mart's policies and standards for the sale of especially dangerous products in terms of their impact on the community, Wal-Mart's reputation, and its brand value and identity.  Moreover, it will be up to management, acting under Board supervision, to decide what those products will be, subject to the Proposal's identification of guns equipped with high capacity magazines as one such product it should consider.

---

[23] *See also JPMorgan Chase & Co.*, No-Action Letter, 2010 WL 147293, at *1 (Mar. 12, 2010) (proposal broadly limited "JPMorgan Chase's decisions to extend credit or provide other financial services to particular types of customers"); *Cent. Fed. Corp.*, No-Action Letter, 2010 WL 943083, at *1 (Mar. 8, 2010) (proposal generally requested that the "board appoint a committee to explore strategic alternatives for maximizing shareholder value"); *Bank of America Corp.*, No-Action Letter, 2010 WL 4922465, at *1 (Feb. 24, 2010) (proposal concerned routine business of "extend[ing] credit" or providing "other financial services"); *Apache Corp.*, No-Action Letter, 2008 WL 615894, at *1-2 (Mar. 5, 2008) (proposal went beyond employment discrimination to advertising, marketing, sales, and charitable contributions); *Dean Foods Co.*, No-Action Letter, 2007 WL 754960, at *1, 11 (Mar. 9, 2007) (proposal concerned production methods and choice of suppliers); *Wal-Mart Stores, Inc.*, No-Action Letter, 1999 WL 152447, at *1-2 (Mar. 15, 1999) (proposal went beyond sweatshop conditions to address "adequate purchasing power" and "sustainable living wage" of employees).

Finally, Wal-Mart claims the Proposal does not concern a transcendent issue of social or corporate policy because, being a retailer rather than manufacturer, it does not bear "sufficient nexus" to the products the Proposal may lead the Board to consider. OB 35. Wal-Mart's distinction makes no sense. The Proposal has a direct nexus to Wal-Mart's long-term shareholder value. A retailer's reputation and its brand are beyond a doubt its most important intangible assets. Further, a company that, like Wal-Mart, holds itself out as a leader in corporate social responsibility – good corporate citizenship – has a strong connection to the need for Board oversight of the policies and standards that make that claim of leadership a reality and not just braggadocio.

Moreover, Wal-Mart and certain *amici curiae* have created this distinction out of whole cloth. In none of the no-action letters on which Wal-Mart purports to rely did the Division grant or deny no action relief on that ground, nor did any of the companies seeking such relief even suggest such a "theory."[24] And with good

---

[24] No-action relief was granted in the letters Wal-Mart cites because the proposals were naked "stop selling" proposals, not because the relevant company was a retailer rather than a manufacturer. *See* OB 35-36 (citing *Wal-Mart Stores, Inc.*, No-Action Letter, 2001 WL 253625, at *1 (Mar. 9, 2001) (proposal requested that Wal-Mart stop selling handguns); *Walgreen Co.*, No-Action Letter, 1997 WL 599903, at *1 (Sep. 29, 1997) (proposal requested that company stop selling tobacco products); *Dillards, Inc.*, No-Action Letter, 2012 WL 173764, at *15 (Feb. 27, 2012) (proposal requested that company develop plan to phase out sale of fur from raccoon dogs); *Rite Aid Corp.*, No-Action Letter, 2009 WL 829472, at *1

47

reason: the Division has consistently denied no-action relief where a company sells

products implicating transcendent policy issues. *See, e.g.*, *Denny's Corp.*, No-

Action Letter, 2009 WL 772857, at *1-3 (Mar. 17, 2009) (denying no-action relief

for proposal concerning sale of cage free eggs); *Wyeth*, No-Action Letter, 2005

WL 326905, at *1 (Feb. 8, 2005) (same for proposal requesting board to

discontinue promoting products pending review of policy for protection of horses);

*see also Wal-Mart Stores, Inc.*, No-Action Letter, 2010 WL 369421, at *1-2 (Mar.

31, 2010) (same for proposal requesting that board require its poultry suppliers to

switch to a particular method of slaughter that is less cruel); *Med. Comm.*, 432 F.2d

at 662, 680-81 (remanding to SEC for explanation of exclusion of shareholder

proposal to amend corporate charter concerning the "sale of" napalm, which

"relates solely to a matter that is completely within the accepted sphere of

corporate activity and control" by shareholders).

### C.     No-Action Letters Are Entitled to Deference Only to the Extent of the Persuasiveness of Their Reasoning

As previously noted, no-action letters from the Division staff are entitled to

deference only to the extent of the persuasiveness of their reasoning. *See supra* at

31-32.  In this case, the No-Action Letter provided *no* reasoning to which this

Court could defer, instead simply offering the *ipse dixit* that there appeared to be

---

(proposal requested report on response to pressure to stop selling tobacco products)).

"some basis" for exclusion of the Proposal.  Such a conclusory statement holds no weight when compared to the well-reasoned decision of the District Court, and the SEC guidance on which it relied.

Even were the Court to conclude that reasoning is not required for a bald conclusion to be persuasive, here there is the additional problem that the letter does not even give lip service to the governance nature of the Proposal or the significant policy issues that are its focus.  Instead, the No-Action Letter mischaracterizes the Proposal as "concerning the sale of particular products and services," (A-288), which *per se* eliminates any persuasive authority the No-Action Letter may have.  *See Amalgamated*, 821 F. Supp. at 888 ("The SEC's views on the issues raised in the 1991 proposal are unclear, because the staff based its conclusion partly on an erroneous characterization of the proposal.").

Further, it bears emphasizing that the Division staff did not resolve the merits of this dispute; it merely stated that it would not recommend enforcement action to the SEC because there "appears to be some basis" for exclusion under Rule 14a-8(i)(7).[25]  "Some basis," of course, is not the standard governing this litigation.  Rather, Wal-Mart bears the burden of establishing as a matter of law that it properly excluded the Proposal under an exception to Rule 14a-8.  *Am.*

---

[25] That the Division purportedly ordinarily applies the "some basis" standard to requests for no action does not help Wal-Mart.  Rather, it demonstrates that the no-action process is one of regulatory enforcement, not an adjudication on the merits.

*Fed'n*, 462 F. 3d at 125 (the Company has the burden of establishing an exception applies). Wal-Mart failed to meet its burden in the District Court, and for the reasons set forth above, it should fare no better here.

Wal-Mart seeks to bolster its no-action letter by citing to the three levels of review a no-action request ordinarily receives. OB 37-38. However, even assuming this is true, it does not transform the no-action process into a reasoned adjudication of the dispute, as the SEC itself recognizes, *see* SEC Release, No. 34-12599, 1976 WL 160411, at *3-5 (July 7, 1976) ("Because the staff's advice on contested proposals is informal and nonjudicial in nature, it does not have precedential value with respect to *identical* or similar proposals submitted to other issuers in the future.") (emphasis added), and it cannot be relied on to trump the SEC's actual explanation of the contours of the ordinary business operations exception. *See supra* at 34-36.

Nor is Wal-Mart helped by citing to other no-action letters "that relate to decisions by retailers concerning the sale of products." OB 36-37 (citing six no-action letters). As the District Court correctly held in response to the very same citations, "[n]one of the letters cited by Wal-Mart involved proposals comparable to Trinity's," (A-22), and thus they do not bear on Wal-Mart's appeal.[26] By

---

[26] As Wal-Mart itself explained in its January 25, 2008 letter to the Division, the *Wal-Mart Stores, Inc.*, *Family Dollar Stores* and *Walgreen Co.* proposals required

50

NEVER

contrast, the Division staff has on numerous occasions denied no-action requests

for proposals that concern ESG issues, including corporate governance,[27] and

broader policy issues involving human rights, environmental and public health, and

animal welfare.[28]  *See also* Table A, Corporate Governance and Public Policy-

---

reporting on the companies' efforts to secure its supply of goods, enter into
commercial and contractual relationships with suppliers, and review, monitor, and
control the shipping of products to suppliers, and thus "interfere[d] with the
Company's ability to operate its business on a day-to-day basis and to make
decisions about what products to buy and from whom to buy them." *Wal-Mart
Stores, Inc.*, No-Action Letter, 2008 WL 5622715, at *4 (Feb. 27, 2008); *see also
The Home Depot, Inc.*, No-Action Letter, 2008 WL 257307, at *3 (Jan. 25, 2008)
(concerning substantially similar proposal).  Wal-Mart does not, because it cannot,
advance the same argument here.

[27] *See, e.g.*, *Citigroup Inc.*, No-Action Letter, 2012 WL 6723109, at *1 (Feb. 15,
2013) (Division refusing to exclude under Rule 14a-8(i)(7) a proposal requesting
"that the board undertake a review and institute any appropriate policy changes . . .
to make it more practical to deny indemnification of directors when appropriate
from the standpoint of Citigroup and public policy"); *Motorola, Inc.*, No-Action
Letter, 2002 WL 480349, at *2 (Mar. 8, 2002) (same regarding proposal that board
"prepare a description of the board's role in the development and monitoring of
Motorola's long-term strategic plan," as such proposal "relates to the Board of
Directors' participation in the development of fundamental business strategy and
long-term plans").

[28] *See, e.g.*, *Citigroup Inc.*, No-Action Letter, 2008 WL 524150, at *1 (Feb. 21,
2008) (refusing no-action request under Rule 14a-8(i)(7) for proposal requesting
report "on how policies address or could address human rights issues, with a view
toward adding appropriate policies and procedures"); *Newmont Mining Corp.*, No-
Action Letter, 2007 WL 403867, at *1 (Feb. 5, 2007) (refusing no-action request
under Rule 14a-8(i)(7) for proposal requesting "that management review and
report on the potential environmental and public health damage resulting from the
company's mining and waste disposal operations in Indonesia"); *see also supra* at
47-48 (citing *Denny's Corp.*, *Wyeth*, and *Wal-Mart Stores, Inc.*).

51

Related No-Action Letters, No. 14-405 (LPS), Docket No. 41-1 (D. Del. June 18, 2014).  Thus, this is not a case like *Donoghue v. Accenture Ltd.*, No. 03 Civ. 8329, 2004 WL 1823448 (S.D.N.Y. Aug. 16, 2004), or *Austin v. Consol. Edison Co.*, 788 F. Supp. 192 (S.D.N.Y. 1992), cited by Wal-Mart, OB 37, 39, where there was a long line of no-action letters dealing with the precise issue presented there.

### D.    Inclusion of the Proposal Will Not Open Any "Floodgates"

Given the legal authorities in opposition to their position on the merits, Wal-Mart and the *amici curiae* in its support resort to claiming that an affirmance of the District Court decision below will open the "floodgates" of shareholder proposals and leave the ordinary business exception "in tatters."  OB 7, 19.  This prediction of "proxy apocalypse" has no basis in reality, and should readily be rejected.

First, this is not a naked "stop selling" proposal, as it does not request that Wal-Mart stop selling anything.  Thus, affirmance here need not lead to a plethora of stop selling proposals.  This case raises an issue of corporate governance over an important policy issue and is substantially similar to the proposals that the Division staff has blessed related to the sale of products produced through sweatshop or forced labor of people or the inhumane treatment of animals.  *See, e.g.*, *Wal-Mart Stores, Inc*, No-Action Letter, 2010 WL 369421, at *1-2 (Mar. 31, 2010) (denying no-action relief for proposal requesting that board require its poultry suppliers to switch to a particular method of slaughter that is less cruel); *Denny's Corp.*, No-

52

Action Letter, 2009 WL 772857, at *1-3 (Mar. 17, 2009) (same for proposal

concerning sale of cage free eggs); *Nordstrom, Inc.*, No-Action Letter, 2000 WL

430825, at *1 (Mar. 31, 2000) (same with regard to proposal requesting report on

vendor standards due to concern over low wages and abusive working conditions);

*Sears, Roebuck & Co.*, No-Action Letter, 1999 WL 80272, at *1 (Feb. 16, 1999)

(same). These denials of no-action relief have not caused the sky to fall.

Moreover, there can only be one proposal of the kind Trinity is advancing for a

company, and only for a company that both sells products especially dangerous to

community, reputation, and/or brand and that also lacks board oversight and

policies regarding such sales.

 One of the *amici* urges that the Proposal is merely "dress[ed] up" as a policy

proposal and that almost any proposal about ordinary business could be so

"dress[ed] up." *See* Soc'y of Corp. Secretaries and Governance Prof'ls. Br. at 2.

There is no merit to this contention either. Trinity's proposal is not just a policy

proposal, it is a governance proposal. Even in that context, the policy must be

about a matter of importance worthy of Board attention, and that requirement is

met here. It must have relevance or nexus for the company in question, and again,

that requirement is met for this Proposal as applied to Wal-Mart. Rather than

Trinity dressing up this proposal as a matter of governance over an important

policy issue, it is Wal-Mart that seeks to dress up the Proposal as merely a matter

of ordinary business.  The sound conclusion is, as observed by Chief Judge Stark, that the Proposal is "best viewed" as a proposal not dealing with a subject related to ordinary business, but as an issue worthy of Board attention.  (A-19).

### III.    The Proposal Is Not Excludable Under Rule 14a-8(i)(3) as "So Inherently Vague or Indefinite"

Rule 14a-8(i)(3) permits a company to exclude a proposal that is "materially false or misleading."  17 C.F.R. § 14a-8(i)(3).  As Wal-Mart acknowledged before the District Court, and as its own citation confirms, a proposal may only be excluded under Rule 14a-8(i)(3) if it is "so inherently vague or indefinite that neither the stockholders voting on the proposal, *nor* the company in implementing the proposal (if adopted), would be able to determine with any reasonable certainty exactly what actions or measures the proposal requires."  SEC Staff Legal Bulletin No. 14B, 2004 WL 3711971, at *4 (Sept. 15, 2004) (emphasis added) (cited at OB 41); *accord* A-24 to A-25 (D. Del. Op.).  Wal-Mart has failed to meet this high bar here.

As the District Court correctly held, "neither stockholders nor Wal-Mart will have any such problem" with the Proposal.  (A-25).  Because the Proposal focuses on corporate governance, the "action[] or measure[]" it requests is the assignment of responsibility to the Committee by adding a new item to the 26 oversight items already in its Charter.  The Division has consistently determined that a proposal's use of terminology that provides board flexibility and discretion is not excludable

as "so inherently vague or indefinite."[29]  Rather, the avoidance of micro-managing a company's implementation of a shareholder proposal is clearly a positive point.

Wal-Mart nonetheless argues that certain terms in the Proposal are too "vague and indefinite," OB 42, and as a result the Proposal must be excluded.  In particular, Wal-Mart claims that the terms "values" and "family or community" are impermissibly vague because values may differ among the families or communities Wal-Mart serves.  *Id.*  However, the Proposal does not address the values of every Wal-Mart community or customer, but only those "family and community values integral to the Company's promotion of its brand."  (A-443).  There can be no dispute that Wal-Mart's Board should know what values are integral to its brand, which is all that is required to preclude exclusion under Rule

---

[29] *See, e.g.*, *Yahoo! Inc.*, No-Action Letter, 2007 WL 1175903, at *1, 3, 14 (Apr. 16, 2007) (denying no-action relief for proposal that sought to establish board committee on human rights, notwithstanding company's argument that definition of "human rights" varies from shareholder to shareholder); *Avaya Inc.*, No-Action Letter, 2006 WL 3007364, at *1, 24 (Oct. 18, 2006) (denying no-action relief where proposal requested that the board establish a pay-for-performance standard incorporating various principles where proponent explained that proposal provided reasonable degree of certainty along with discretion to the committee); *iRobot Corp.*, No-Action Letter, 2013 WL 267335, at *1, 6 (Mar. 26, 2013) (denying no-action relief where proponent noted that "[a] proposal is not vague for merely granting the board broad discretion"); *Walt Disney Co.*, No-Action Letter, 2012 WL 5267955, at * 1, 19 (Dec. 13, 2012) (denying no-action relief for "proxy access" proposal where the proponent argued that "[t]he Proposal does what shareholder resolutions are supposed to do: raise a policy issue that is appropriate for shareholders to consider and leave the details of implementation to the company").

14a-8(i)(3).[30]  For that reason, the Division has routinely denied no-action relief for

proposals seeking consistency with a company's values.[31]  It is readily apparent to

Trinity, and thus almost certainly to Wal-Mart's other shareholders, that those

values focus on good corporate citizenship and caring for the families and

communities Wal-Mart serves.  *See supra* "Wal-Mart's Corporate Ethic and

Merchandising Practices," at 11.

Wal-Mart also claims uncertainty in the terms "many," "offensive," and

"substantial impairment."  These terms are both commonly used and defined in the

dictionary, and thus the claim that they are "inherently vague" is entirely without

merit.  Indeed, when Wal-Mart apologized for its "inappropriate promotion of a

---

[30] Wal-Mart has consistently told its shareholders that family and community comprise its core values.  *See* Walmart 2014 Global Responsibility Report at 16 (2014), http://www.corporatereport.com/walmart/2014/grr/_pdf/Walmart_2014_GRR.pdf ("From the beginning, our values – integrity, opportunity, *family and community*, purpose and responsibility – have served as our core strengths and will continue to drive our success moving forward." (emphasis added)); Walmart 2013 Global Responsibility Report at 74 (2013), http://corporate.walmart.com/microsites/global-responsibility-report-2013/pdf/Walmart_sGRR.pdf (same); Mike Duke, President and CEO of Wal-Mart Stores, Inc., Remarks at Walmart Shareholders' Meeting 2012: Walmart's Enduring Values, http://news.walmart.com/executive-viewpoints/walmarts-enduring-values ("Third, we believe in family and community. . . .  At Walmart, we are family and community").

[31] *See, e.g.*, *Intel Corp.*,  No-Action Letter, 2012 WL 160565, at *1-2 (Feb. 23, 2012); *Merck & Co.*, No-Action Letter, 2003 WL 942796, at *1-2 (Feb. 26, 2003); *Western Union Co.*, No-Action Letter, 2013 WL 368364, at * 1-3 (Mar. 14, 2013).

series of African American films," it issued a media statement that used the words

"offensive" or "very offensive" repeatedly to describe what had happened.  Wal-

Mart, Inc., "Media Statement Re: Movie Cross-Selling Issue" (Jan. 5, 2006),

*available at* http://news.walmart.com/news-archive/2006/01/05/media-statement-

re-movie-cross-selling-issue-on-walmartcom.

Numerous no-action letters make clear that because there is inherent

ambiguity in all language, the terms of a proposal need not, and could not, be

defined with absolute precision.  Just this past year in *NetApp, Inc.*, No-Action

Letter, 2014 WL 1878421 (June 27, 2014), the Staff denied no-action relief under

Rule 14a-8(i)(3) for a proposal requesting board oversight over the company's

"policies and practice that relate to public policy including human rights, corporate

social responsibility . . . and other public issues that may affect the Company's

operations, performance or reputation, and shareholders' value."  2014 WL

1878421, at *1, 4.[32]  By contrast, the no-action letters Wal-Mart cites to support its

---

[32] *See also ConocoPhillips*, No-Action Letter, 2005 WL 484408, at *1 (Feb. 24,
2005) (denying no-action relief for proposal requesting that potential board
candidates have "the highest personal and petroleum qualifications, integrity and
values"); *Dominion Res., Inc.*, No-Action Letter, 2011 WL 494126, at *1-3 (Feb.
9, 2011) (same regarding request that board "be open and honest with us about the
enormous costs and risks of new nuclear construction" and "invest in demand
control and new renewable generation sources for the safest and quickest returns to
shareholders, stakeholders, community and country"); *Assocs. First Capital Corp.*,
No-Action Letter, 1999 WL 68604, at *1 (Feb. 12, 1999) (same with regard to
request that the board "make greater efforts to ensure that women and persons from

"vagueness" claim are not relevant here.  OB 41-43.  In the first instance, Wal-Mart cites a number of proposals where the proponent provided no response to the no-action request, and thus the Staff decided the request without opposition.[33]  The remainder of Wal-Mart's letters contain statements that are simply not comparable to those identified by Wal-Mart in the Proposal.[34]

Wal-Mart also argues that the Proposal is not clear as to "which of the hundreds of thousands of products that Wal-Mart sells are encompassed by the Proposal," noting that the Proposal "states that . . . guns [equipped with high capacity magazines] are 'just one example' of the types of products that the Proposal is intended to address."  OB 43.  However, the Proposal references guns equipped with high capacity magazines to assure that they are among the products especially dangerous to the community or Wal-Mart's reputation or brand value

minority and racial groups are considered for nomination to the board"); *Kroger Co.*, No-Action Letter, 2002 WL 1052022, at *1 (Apr. 12, 2002) (same regarding proposal that board adopt policy to identify and label food products that contain genetically engineered ingredients until testing demonstrates that engineered crops are not harmful).

[33] *See Berkshire Hathaway Inc.*, No-Action Letter, 2011 WL 6859125 (Jan. 31, 2012); *Puget Energy, Inc.*, No-Action Letter, 2002 WL 523341 (Mar. 7, 2002).

[34] *See Staples, Inc.*, No-Action Letter, 2012 WL 748854, at *1,7 (Mar. 5, 2012) (finding "some basis" for exclusion as vague proposal that used the highly technical but unexplained language "pro rata vesting upon termination"); *Boeing Co.*, No-Action Letter, 2011 WL 757455, at *1 (Mar. 2, 2011) (same with regard to use of undefined term "executive pay rights," but only on reconsideration after company noted recent no-action letters granting relief based on same phrase).

and identity that fall within the oversight requested by the Proposal.  The class of

products covered is indicated with adequate specificity to allow management under

Board supervision to particularize the covered products.  As the District Court

explained, this argument "merely illustrates, again, that the Proposal properly

leaves the details of any policy formulation and implementation to the discretion of

the Committee, showing once more that the Proposal does not dictate any

particular outcome or micro-manage Wal-Mart's day-to-day business."  (A-25).

## CONCLUSION

For the foregoing reasons, Trinity respectfully requests that this Court affirm

the District Court's grant of summary judgment in favor of Trinity.

Dated:  February 4, 2015                FRIEDLANDER & GORRIS, P.A.


                                        */s/ Joel Friedlander*
                                        Joel Friedlander (Bar No. 3163)
                                        Christopher M. Foulds (Bar No. 5169)
                                        222 Delaware Avenue, Suite 1400
                                        Wilmington, DE 19801
                                        (302) 573-3500
                                        jfriedlander@friedlandergorris.com
                                        cfoulds@friedlandergorris.com

                                        *Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(b) because it contains 13,931 words, excluding those parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(b)(iii).

The foregoing brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Times New Roman font, using Microsoft Word 2010.

Dated:  February 4, 2015                    FRIEDLANDER & GORRIS, P.A.


                                            */s/ Joel Friedlander*
                                            Joel Friedlander (Bar No. 3163)
                                            Christopher M. Foulds (Bar No. 5169)
                                            222 Delaware Avenue, Suite 1400
                                            Wilmington, DE 19801
                                            (302) 573-3500
                                            jfriedlander@friedlandergorris.com
                                            cfoulds@friedlandergorris.com

                                            *Counsel for Plaintiff-Appellee*

## <u>THIRD CIRCUIT RULE 28.3(d) CERTIFICATION</u>

Pursuant to Third Circuit Rule 28.3(d), the undersigned counsel for Plaintiff-

Appellee certifies that Joel Friedlander is a member of the bar of this court.

Dated:  February 4, 2015            FRIEDLANDER & GORRIS, P.A.


*/s/ Joel Friedlander*
Joel Friedlander (Bar No. 3163)
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
(302) 573-3500
jfriedlander@friedlandergorris.com

*Counsel for Plaintiff-Appellee*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I, Joel Friedlander, hereby certify that, on February 4, 2015, **Appellee's**

**Answering Brief** was electronically filed with the Clerk of the United States Court

of Appeals for the Third Circuit using CM-ECF which will send notification to the

registered participants.

I further certify that I caused the required number of copies of Appellee's

Answering Brief to be filed with the Clerk's Office of the United States Court of

Appeals for the Third Circuit, via Federal Express.

Dated:  February 4, 2015                FRIEDLANDER & GORRIS, P.A.


                                        */s/ Joel Friedlander*
                                        Joel Friedlander (Bar No. 3163)
                                        Christopher M. Foulds (Bar No. 5169)
                                        222 Delaware Avenue, Suite 1400
                                        Wilmington, DE 19801
                                        (302) 573-3500
                                        jfriedlander@friedlandergorris.com
                                        cfoulds@friedlandergorris.com

                                        *Counsel for Plaintiff-Appellee*

## <u>CERTIFICATE OF DIGITAL SUBMISSION AND VIRUS CHECK</u>

I hereby certify that a copy of the foregoing document was submitted in digital format, is an exact copy of the written document filed with the Clerk of the U.S. Court of Appeals for the Third Circuit, and is free from viruses according to a scan for viruses conducted with Vipre Business Version 6.2.5530.0.

Dated:  February 4, 2015              FRIEDLANDER & GORRIS, P.A.


                                      */s/ Joel Friedlander*
                                      Joel Friedlander (Bar No. 3163)
                                      Christopher M. Foulds (Bar No. 5169)
                                      222 Delaware Avenue, Suite 1400
                                      Wilmington, DE 19801
                                      (302) 573-3500
                                      jfriedlander@friedlandergorris.com
                                      cfoulds@friedlandergorris.com

                                      *Counsel for Plaintiff-Appellee*

ADDENDUM

## <u>TABLE OF CONTENTS</u>

<u>**Pages**</u>

17 CFR § 240 14a–8 Shareholder Proposals ......................................................................Add-1

Code of Federal Regulations
    Title 17. Commodity and Securities Exchanges
        Chapter II. Securities and Exchange Commission
            Part 240. General Rules and Regulations, Securities Exchange Act of 1934 (Refs & Annos)
                Subpart A. Rules and Regulations Under the Securities Exchange Act of 1934
                    Regulation 14a: Solicitation of Proxies (Refs & Annos)

17 C.F.R. § 240.14a–8

§ 240.14a–8 Shareholder proposals.

Effective: September 20, 2011
Currentness

This section addresses when a company must include a shareholder's proposal in its proxy statement and identify the proposal in its form of proxy when the company holds an annual or special meeting of shareholders. In summary, in order to have your shareholder proposal included on a company's proxy card, and included along with any supporting statement in its proxy statement, you must be eligible and follow certain procedures. Under a few specific circumstances, the company is permitted to exclude your proposal, but only after submitting its reasons to the Commission. We structured this section in a question-and-answer format so that it is easier to understand. The references to "you" are to a shareholder seeking to submit the proposal.

(a) Question 1: What is a proposal? A shareholder proposal is your recommendation or requirement that the company and/or its board of directors take action, which you intend to present at a meeting of the company's shareholders. Your proposal should state as clearly as possible the course of action that you believe the company should follow. If your proposal is placed on the company's proxy card, the company must also provide in the form of proxy means for shareholders to specify by boxes a choice between approval or disapproval, or abstention. Unless otherwise indicated, the word "proposal" as used in this section refers both to your proposal, and to your corresponding statement in support of your proposal (if any).

(b) Question 2: Who is eligible to submit a proposal, and how do I demonstrate to the company that I am eligible?

(1) In order to be eligible to submit a proposal, you must have continuously held at least $2,000 in market value, or 1%, of the company's securities entitled to be voted on the proposal at the meeting for at least one year by the date you submit the proposal. You must continue to hold those securities through the date of the meeting.

(2) If you are the registered holder of your securities, which means that your name appears in the company's records as a shareholder, the company can verify your eligibility on its own, although you will still have to provide the company with a written statement that you intend to continue to hold the securities through the date of the meeting of shareholders. However, if like many shareholders you are not a registered holder, the company likely does not know that you are a shareholder, or how many shares you own. In this case, at the time you submit your proposal, you must prove your eligibility to the company in one of two ways:

(i) The first way is to submit to the company a written statement from the "record" holder of your securities (usually a broker or bank) verifying that, at the time you submitted your proposal, you continuously held the securities for at least

one year. You must also include your own written statement that you intend to continue to hold the securities through the date of the meeting of shareholders; or

(ii) The second way to prove ownership applies only if you have filed a Schedule 13D (§ 240.13d–101), Schedule 13G (§ 240.13d–102), Form 3 (§ 249.103 of this chapter), Form 4 (§ 249.104 of this chapter) and/or Form 5 (§ 249.105 of this chapter), or amendments to those documents or updated forms, reflecting your ownership of the shares as of or before the date on which the one-year eligibility period begins. If you have filed one of these documents with the SEC, you may demonstrate your eligibility by submitting to the company:

(A) A copy of the schedule and/or form, and any subsequent amendments reporting a change in your ownership level;

(B) Your written statement that you continuously held the required number of shares for the one-year period as of the date of the statement; and

(C) Your written statement that you intend to continue ownership of the shares through the date of the company's annual or special meeting.

(c) Question 3: How many proposals may I submit? Each shareholder may submit no more than one proposal to a company for a particular shareholders' meeting.

(d) Question 4: How long can my proposal be? The proposal, including any accompanying supporting statement, may not exceed 500 words.

(e) Question 5: What is the deadline for submitting a proposal?

(1) If you are submitting your proposal for the company's annual meeting, you can in most cases find the deadline in last year's proxy statement. However, if the company did not hold an annual meeting last year, or has changed the date of its meeting for this year more than 30 days from last year's meeting, you can usually find the deadline in one of the company's quarterly reports on Form 10–Q (§ 249.308a of this chapter), or in shareholder reports of investment companies under § 270.30d–1 of this chapter of the Investment Company Act of 1940. In order to avoid controversy, shareholders should submit their proposals by means, including electronic means, that permit them to prove the date of delivery.

(2) The deadline is calculated in the following manner if the proposal is submitted for a regularly scheduled annual meeting. The proposal must be received at the company's principal executive offices not less than 120 calendar days before the date of the company's proxy statement released to shareholders in connection with the previous year's annual meeting. However, if the company did not hold an annual meeting the previous year, or if the date of this year's annual meeting has been changed by more than 30 days from the date of the previous year's meeting, then the deadline is a reasonable time before the company begins to print and send its proxy materials.

(3) If you are submitting your proposal for a meeting of shareholders other than a regularly scheduled annual meeting, the deadline is a reasonable time before the company begins to print and send its proxy materials.

(f) Question 6: What if I fail to follow one of the eligibility or procedural requirements explained in answers to Questions 1 through 4 of this section?

(1) The company may exclude your proposal, but only after it has notified you of the problem, and you have failed adequately to correct it. Within 14 calendar days of receiving your proposal, the company must notify you in writing of any procedural or eligibility deficiencies, as well as of the time frame for your response. Your response must be postmarked, or transmitted electronically, no later than 14 days from the date you received the company's notification. A company need not provide you such notice of a deficiency if the deficiency cannot be remedied, such as if you fail to submit a proposal by the company's properly determined deadline. If the company intends to exclude the proposal, it will later have to make a submission under § 240.14a–8 and provide you with a copy under Question 10 below, § 240.14a–8(j).

(2) If you fail in your promise to hold the required number of securities through the date of the meeting of shareholders, then the company will be permitted to exclude all of your proposals from its proxy materials for any meeting held in the following two calendar years.

(g) Question 7: Who has the burden of persuading the Commission or its staff that my proposal can be excluded? Except as otherwise noted, the burden is on the company to demonstrate that it is entitled to exclude a proposal.

(h) Question 8: Must I appear personally at the shareholders' meeting to present the proposal?

(1) Either you, or your representative who is qualified under state law to present the proposal on your behalf, must attend the meeting to present the proposal. Whether you attend the meeting yourself or send a qualified representative to the meeting in your place, you should make sure that you, or your representative, follow the proper state law procedures for attending the meeting and/or presenting your proposal.

(2) If the company holds its shareholder meeting in whole or in part via electronic media, and the company permits you or your representative to present your proposal via such media, then you may appear through electronic media rather than traveling to the meeting to appear in person.

(3) If you or your qualified representative fail to appear and present the proposal, without good cause, the company will be permitted to exclude all of your proposals from its proxy materials for any meetings held in the following two calendar years.

(i) Question 9: If I have complied with the procedural requirements, on what other bases may a company rely to exclude my proposal?

(1) Improper under state law: If the proposal is not a proper subject for action by shareholders under the laws of the jurisdiction of the company's organization;

Note to paragraph (i)(1): Depending on the subject matter, some proposals are not considered proper under state law if they would be binding on the company if approved by shareholders. In our experience, most proposals that are cast as

recommendations or requests that the board of directors take specified action are proper under state law. Accordingly, we will assume that a proposal drafted as a recommendation or suggestion is proper unless the company demonstrates otherwise.

(2) Violation of law: If the proposal would, if implemented, cause the company to violate any state, federal, or foreign law to which it is subject;

Note to paragraph (i)(2): We will not apply this basis for exclusion to permit exclusion of a proposal on grounds that it would violate foreign law if compliance with the foreign law would result in a violation of any state or federal law.

(3) Violation of proxy rules: If the proposal or supporting statement is contrary to any of the Commission's proxy rules, including § 240.14a–9, which prohibits materially false or misleading statements in proxy soliciting materials;

(4) Personal grievance; special interest: If the proposal relates to the redress of a personal claim or grievance against the company or any other person, or if it is designed to result in a benefit to you, or to further a personal interest, which is not shared by the other shareholders at large;

(5) Relevance: If the proposal relates to operations which account for less than 5 percent of the company's total assets at the end of its most recent fiscal year, and for less than 5 percent of its net earnings and gross sales for its most recent fiscal year, and is not otherwise significantly related to the company's business;

(6) Absence of power/authority: If the company would lack the power or authority to implement the proposal;

(7) Management functions: If the proposal deals with a matter relating to the company's ordinary business operations;

(8) Director elections: If the proposal:

(i) Would disqualify a nominee who is standing for election;

(ii) Would remove a director from office before his or her term expired;

(iii) Questions the competence, business judgment, or character of one or more nominees or directors;

(iv) Seeks to include a specific individual in the company's proxy materials for election to the board of directors; or

(v) Otherwise could affect the outcome of the upcoming election of directors.

(9) Conflicts with company's proposal: If the proposal directly conflicts with one of the company's own proposals to be submitted to shareholders at the same meeting;

Add-4

Note to paragraph (i)(9): A company's submission to the Commission under this section should specify the points of conflict with the company's proposal.


(10) Substantially implemented: If the company has already substantially implemented the proposal;

Note to paragraph (i)(10): A company may exclude a shareholder proposal that would provide an advisory vote or seek future advisory votes to approve the compensation of executives as disclosed pursuant to Item 402 of Regulation S–K (§ 229.402 of this chapter) or any successor to Item 402 (a "say-on-pay vote") or that relates to the frequency of say-on-pay votes, provided that in the most recent shareholder vote required by § 240.14a–21(b) of this chapter a single year (i.e., one, two, or three years) received approval of a majority of votes cast on the matter and the company has adopted a policy on the frequency of say-on-pay votes that is consistent with the choice of the majority of votes cast in the most recent shareholder vote required by § 240.14a–21(b) of this chapter.


(11) Duplication: If the proposal substantially duplicates another proposal previously submitted to the company by another proponent that will be included in the company's proxy materials for the same meeting;


(12) Resubmissions: If the proposal deals with substantially the same subject matter as another proposal or proposals that has or have been previously included in the company's proxy materials within the preceding 5 calendar years, a company may exclude it from its proxy materials for any meeting held within 3 calendar years of the last time it was included if the proposal received:


(i) Less than 3% of the vote if proposed once within the preceding 5 calendar years;


(ii) Less than 6% of the vote on its last submission to shareholders if proposed twice previously within the preceding 5 calendar years; or


(iii) Less than 10% of the vote on its last submission to shareholders if proposed three times or more previously within the preceding 5 calendar years; and


(13) Specific amount of dividends: If the proposal relates to specific amounts of cash or stock dividends.


(j) Question 10: What procedures must the company follow if it intends to exclude my proposal?


(1) If the company intends to exclude a proposal from its proxy materials, it must file its reasons with the Commission no later than 80 calendar days before it files its definitive proxy statement and form of proxy with the Commission. The company must simultaneously provide you with a copy of its submission. The Commission staff may permit the company to make its submission later than 80 days before the company files its definitive proxy statement and form of proxy, if the company demonstrates good cause for missing the deadline.


(2) The company must file six paper copies of the following:

(i) The proposal;

(ii) An explanation of why the company believes that it may exclude the proposal, which should, if possible, refer to the most recent applicable authority, such as prior Division letters issued under the rule; and

(iii) A supporting opinion of counsel when such reasons are based on matters of state or foreign law.

(k) Question 11: May I submit my own statement to the Commission responding to the company's arguments?

Yes, you may submit a response, but it is not required. You should try to submit any response to us, with a copy to the company, as soon as possible after the company makes its submission. This way, the Commission staff will have time to consider fully your submission before it issues its response. You should submit six paper copies of your response.

(l) Question 12: If the company includes my shareholder proposal in its proxy materials, what information about me must it include along with the proposal itself?

(1) The company's proxy statement must include your name and address, as well as the number of the company's voting securities that you hold. However, instead of providing that information, the company may instead include a statement that it will provide the information to shareholders promptly upon receiving an oral or written request.

(2) The company is not responsible for the contents of your proposal or supporting statement.

(m) Question 13: What can I do if the company includes in its proxy statement reasons why it believes shareholders should not vote in favor of my proposal, and I disagree with some of its statements?

(1) The company may elect to include in its proxy statement reasons why it believes shareholders should vote against your proposal. The company is allowed to make arguments reflecting its own point of view, just as you may express your own point of view in your proposal's supporting statement.

(2) However, if you believe that the company's opposition to your proposal contains materially false or misleading statements that may violate our anti-fraud rule, § 240.14a–9, you should promptly send to the Commission staff and the company a letter explaining the reasons for your view, along with a copy of the company's statements opposing your proposal. To the extent possible, your letter should include specific factual information demonstrating the inaccuracy of the company's claims. Time permitting, you may wish to try to work out your differences with the company by yourself before contacting the Commission staff.

(3) We require the company to send you a copy of its statements opposing your proposal before it sends its proxy materials, so that you may bring to our attention any materially false or misleading statements, under the following timeframes:

(i) If our no-action response requires that you make revisions to your proposal or supporting statement as a condition to requiring the company to include it in its proxy materials, then the company must provide you with a copy of its opposition statements no later than 5 calendar days after the company receives a copy of your revised proposal; or

(ii) In all other cases, the company must provide you with a copy of its opposition statements no later than 30 calendar days before its files definitive copies of its proxy statement and form of proxy under § 240.14a–6.

**Credits**

[41 FR 53000, Dec. 3, 1976, as amended at 43 FR 58530, Dec. 14, 1978; 44 FR 68456, 68770, Nov. 29, 1979; 48 FR 38222, Aug. 23, 1983; 50 FR 48181, Nov. 22, 1985; 51 FR 42062, Nov. 20, 1986; 52 FR 21936, June 10, 1987; 52 FR 48983, Dec. 29, 1987; 63 FR 29119, May 28, 1998; 63 FR 50622, Sept. 22, 1998; 72 FR 4168, Jan. 29, 2007; 72 FR 70456, Dec. 11, 2007; 73 FR 977, Jan. 4, 2008; 75 FR 56782, Sept. 16, 2010; 75 FR 64641, Oct. 20, 2010; 76 FR 6045, Feb. 2, 2011; 76 FR 58100, Sept. 20, 2011]

SOURCE: 50 FR 27946, July 9, 1985; 50 FR 28394, July 12, 1985; 50 FR 37654, Sept. 17, 1985; 50 FR 41870, Oct. 16, 1985; 50 FR 42678, Oct. 22, 1985; 51 FR 8801, March 14, 1986; 51 FR 12127, April 9, 1986; 51 FR 14982, April 22, 1986; 51 FR 18580, May 21, 1986; 51 FR 25882, July 17, 1986; 51 FR 36551, Oct. 14, 1986; 51 FR 44275, Dec. 9, 1986; 52 FR 3000, Jan. 30, 1987; 52 FR 8877, March 20, 1987; 52 FR 9154, March 23, 1987; 52 FR 16838, May 6, 1987; 52 FR 27969, June 24, 1987; 52 FR 42279, Nov. 4, 1987; 53 FR 26394, July 12, 1988; 53 FR 33459, Aug. 31, 1988; 53 FR 37289, Sept. 26, 1988; 54 FR 23976, June 5, 1989; 54 FR 28813, July 10, 1989; 54 FR 30031, July 18, 1989; 54 FR 35481, Aug. 28, 1989; 54 FR 37789, Sept. 13, 1989; 55 FR 23929, June 13, 1990; 55 FR 50320, Dec. 6, 1990; 56 FR 7265, Feb. 21, 1991; 56 FR 9129, March 5, 1991; 56 FR 12118, March 22, 1991; 56 FR 19156, April 25, 1991; 56 FR 28322, June 20, 1991; 56 FR 30067, July 1, 1991; 57 FR 18218, April 29, 1992; 57 FR 32168, July 21, 1992; 57 FR 36501, Aug. 13, 1992; 57 FR 47409, Oct. 16, 1992; 58 FR 14682, March 18, 1993; 59 FR 10985, March 9, 1994; 59 FR 55012, Nov. 2, 1994; 59 FR 66709, Dec. 28, 1994; 61 FR 48328, Sept. 12, 1996; 62 FR 543, Jan. 3, 1997; 62 FR 6071, Feb. 10, 1997; 62 FR 12749, March 18, 1997; 62 FR 35340, July 1, 1997; 63 FR 8102, Feb. 18, 1998; 63 FR 13944, March 23, 1998; 65 FR 76087, Dec. 5, 2000; 66 FR 21659, May 1, 2001; 66 FR 43741, Aug. 20, 2001; 66 FR 55837, 55838, Nov. 2, 2001; 67 FR 247, Jan. 2, 2002; 67 FR 57288, Sept. 9, 2002; 67 FR 58299, Sept. 13, 2002; 68 FR 4355, Jan. 28, 2003; 68 FR 5364, Feb. 3, 2003; 68 FR 18818, April 16, 2003; 68 FR 36665, June 18, 2003; 68 FR 64970, Nov. 17, 2003; 68 FR 67009, Nov. 28, 2003; 68 FR 69221, Dec. 11, 2003; 71 FR 65407, Nov. 8, 2006; 71 FR 74708, Dec. 12, 2006; 71 FR 76596, Dec. 21, 2006; 72 FR 4166, Jan. 29, 2007; 74 FR 68365, Dec. 23, 2009; 75 FR 2794, Jan. 19, 2010; 75 FR 9081, Feb. 26, 2010; 75 FR 54477, Sept. 8, 2010; 75 FR 64653, Oct. 20, 2010; 76 FR 4511, Jan. 26, 2011; 76 FR 6045, Feb. 2, 2011; 76 FR 34363, June 13, 2011; 76 FR 34590, June 14, 2011; 76 FR 41685, July 15, 2011; 76 FR 46620, Aug. 3, 2011; 76 FR 71876, Nov. 21, 2011; 77 FR 30751, May 23, 2012; 77 FR 38454, June 27, 2012; 77 FR 41647, July 13, 2012; 77 FR 48356, Aug. 13, 2012; 77 FR 56362, Sept. 12, 2012; 77 FR 56417, Sept. 12, 2012; 77 FR 66285, Nov. 2, 2012; 77 FR 73305, Dec. 10, 2012; 78 FR 4783, Jan. 23, 2013; 78 FR 42450, July 16, 2013; 78 FR 67633, Nov. 12, 2013; 79 FR 1548, Jan. 8, 2014; 79 FR 39159, July 9, 2014; 79 FR 47369, Aug. 12, 2014; 79 FR 55261, Sept. 15, 2014; 79 FR 57344, Sept. 24, 2014, unless otherwise noted.

AUTHORITY: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c–3, 78c–5, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78k, 78k–1, 78*l*, 78m, 78n, 78n–1, 78*o*, 78*o*–4, 78*o*–10, 78p, 78q, 78q–1, 78s, 78u–5, 78w, 78x, 78*ll*, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, 7201 et seq.; and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5221(e)(3); 18 U.S.C. 1350; and Pub.L. 111–203, 939A, 124 Stat. 1376, (2010), unless otherwise noted.; Section 240.3a4–1 also issued under secs. 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121 as amended;; Section 240.3a12–8 also issued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), and 23(a), 15 U.S.C. 78w(a);; Section 240.3a12–10 also issued under 15 U.S.C. 78b and c;; Section 240.3a12–9 also issued under secs. 3(a)(12), 7(c), 11(d)(1), 15 U.S.C. 78c(a)(12), 78g(c), 78k(d)(1);; Sections 240.3a43–1 and 240.3a44–1 also issued under sec. 3; 15 U.S.C. 78c;; Sections 3a67–1 through 3a67–9 and 3a71–1 and 3a71–2 are also issued under Pub.L. 111–203, §§ 712, 761(b), 124 Stat. 1841 (2010).; Sections 240.3a67–10,

240.3a71–3, 240.3a71–4, and 240.3a71–5 are also issued under Pub.L. 111–203, section 761(b), 124 Stat. 1754 (2010), and 15 U.S.C. 78dd(c). ; Section 240.3b–6 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.3b–9 also issued under secs. 2, 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121, as amended (15 U.S.C. 78b, 78c, 78*o*);; Section 240.9b–1 is also issued under sec. 2, 7, 10, 19(a), 48 Stat. 74, 78, 81, 85; secs. 201, 205, 209, 120, 48 Stat. 905, 906, 908; secs. 1–4, 8, 68 Stat. 683, 685; sec. 12(a), 73 Stat. 143; sec. 7(a), 74 Stat. 412; sec. 27(a), 84 Stat. 1433; sec. 308(a)(2), 90 Stat. 57; sec. 505, 94 Stat. 2292; secs. 9, 15, 23(a), 48 Stat. 889, 895, 901; sec. 230(a), 49 Stat. 704; secs. 3, 8, 49 Stat. 1377, 1379; sec. 2, 52 Stat. 1075; secs. 6, 10, 78 Stat. 570–574, 580; sec. 11(d), 84 Stat. 121; sec. 18, 89 Stat. 155; sec. 204, 91 Stat. 1500; 15 U.S.C. 77b, 77g, 77j, 77s(a), 78i, 78*o*, 78w(a);; Section 240.10b–10 is also issued under secs. 2, 3, 9, 10, 11, 11A, 15, 17, 23, 48 Stat. 891, 89 Stat. 97, 121, 137, 156, (15 U.S.C. 78b, 78c, 78i, 78j, 78k, 78k–1, 78*o*, 78q);; Section 240.12a–7 also issued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), 6, 15 U.S.C. 78(f), 11A, 15 U.S.C. 78k, 12, 15 U.S.C. 78(l), and 23(a)(1), 15 U.S.C. 78(w)(a)(1).; Sections 240.12b–1 to 240.12b–36 also issued under secs. 3, 12, 13, 15, 48 Stat. 892, as amended 894, 895, as amended; 15 U.S.C. 78c, 78*l*, 78m, 78*o*;; Section 240.12b–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.12b–25 is also issued under 15 U.S.C. 80a–8, 80a–24(a), 80a–29, and 80a–37.; Section 240.12g–3 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.12g3–2 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.13a–10 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13a–11 is also issued under secs. 3(a) and 306(a), Pub.L. 107–204, 116 Stat. 745.; Section 240.13a–14 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13a–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13d–3 is also issued under Public Law 111–203 § 766, 124 Stat. 1799 (2010).; Sections 240.13e–4, 240.14d–7, 240.14d–10 and 240.14e–1 also issued under secs. 3(b), 9(a)(6), 10(b), 13(e), 14(d) and 14(e), 15 U.S.C. 78c(b), 78i(a)(6), 78j(b), 78m(e), 78n(d) and 78n(e) and sec. 23(c) of the Investment Company Act of 1940, 15 U.S.C. 80a–23(c);; Sections 240.13e–4 to 240.13e–101 also issued under secs. 3(b), 9(a)(6), 10(b), 13(e), 14(e), 15(c)(1), 48 Stat. 882, 889, 891, 894, 895, 901, sec. 8, 49 Stat. 1379, sec. 5, 78 Stat. 569, 570, secs. 2, 3, 82 Stat. 454, 455, secs. 1, 2, 3–5, 84 Stat. 1497, secs. 3, 18, 89 Stat. 97, 155; 15 U.S.C. 78c(b), 78i(a)(6), 78j(b), 78m(e), 78n(e), 78*o*(c); sec. 23(c) of the Investment Company Act of 1940

54 Stat. 825; 15 U.S.C. 80a–23(c);; Section 240.13f–2(T) also issued under sec. 13(f)(1) (15 U.S.C. 78m(f)(1));; Section 240.13p–1 is also issued under sec. 1502, Pub.L. 111–203, 124 Stat. 1376.; Section 240.13q–1 is also issued under sec. 1504, Pub.L. 111–203, 124 Stat. 2220.; Sections 240.14a–1, 240.14a–3, 240.14a–13, 240.14b–1, 240.14b–2, 240.14c–1, and 240.14c–7 also issued under secs. 12, 15 U.S.C. 781, and 14, Pub.L. 99–222, 99 Stat. 1737,15 U.S.C. 78n;; Sections 240.14a–3, 240.14a–13, 240.14b–1 and 240.14c–7 also issued under secs. 12, 14 and 17, 15 U.S.C. 781, 78n and 78g;; Sections 240.14c–1 to 240.14c–101 also issued under sec. 14, 48 Stat. 895; 15 U.S.C. 78n;; Section 240.14d–1 is also issued under 15 U.S.C. 77g, 77j, 77s(a), 77ttt(a), 80a–37.; Section 240.14e–2 is also issued under 15 U.S.C. 77g, 77h, 77s(a), 77sss, 80a–37(a).; Section 240.14e–4 also issued under the Exchange Act, 15 U.S.C. 78a et seq., and particularly sections 3(b), 10(a), 10(b), 14(e), 15(c), and 23(a) of the Exchange Act (15 U.S.C. 78c(b), 78j(a), 78j(b), 78n(e), 78*o*(c), and 78w(a)).; Section 240.15a–6, also issued under secs. 3, 10, 15, and 17, 15 U.S.C. 78c, 78j, 78*o*, and 78q;; Section 240.15b1–3 also issued under sec. 15, 17; 15 U.S.C. 78*o*78q;; Sections 240.15b1–3 and 240.15b2–1 also issued under 15 U.S.C. 78*o*, 78q;; Section 240.15b2–2 also issued under secs. 3, 15; 15 U.S.C. 78c, 78*o*;; Sections 240.15b10–1 to 240.15b10–9 also issued under secs. 15, 17, 48 Stat. 895, 897, sec. 203, 49 Stat. 704, secs. 4, 8, 49 Stat. 1379, sec. 5, 52 Stat. 1076, sec. 6, 78 Stat. 570; 15 U.S.C. 78*o*, 78q, 12 U.S.C. 241 nt.;; Section 240.15c2–6, also issued under secs. 3, 10, and 15, 15 U.S.C. 78c, 78j, and 78*o*.; Section 240.15c2–11 also issued under 15 U.S.C. 78j(b), 78*o*(c), 78q(a), and 78w(a).; Section 240.15c2–12 also issued under 15 U.S.C. 78b, 78c, 78j, 78*o*, 78*o*–4 and 78q.; Section 240.15c3–1 is also issued under secs. 15(c)(3), 15 U.S.C. 78*o*(c)(3).; Sections 240.15c3–1a, 240.15c3–1e, 240.15c3–1f, 240.15c3–1g are also issued under Pub.L. 111–203, secs. 939, 939A, 124. Stat. 1376 (2010) (15 U.S.C. 78c, 15 U.S.C. 78*o*–7 note).; Section 240.15c3–3 is also issued under 15 U.S.C. 78*o*(c)(2), 78(c)(3), 78q(a), 78w(a); sec. 6(c), 84 Stat. 1652; 15 U.S.C. 78fff.; Section 240.15c3–3a is also issued under Pub.L. 111–203, §§ 939, 939A, 124. Stat. 1376 (2010) (15 U.S.C. 78c, 15 U.S.C. 78*o*–7 note).; Section 240.15c3–3(o) is also issued under Pub.L. 106–554, 114 Stat. 2763, section 203.; Section 240.15d–5 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.15d–10 is also issued under 15 U.S.C. 80a–20(a) and 80a–37(a), and secs. 3(a) and 302, Pub.L. 107–204, 116 Stat. 745.; Section 240.15d–11 is also issued under secs. 3(a) and 306(a), Pub.L. 107–204, 116 Stat. 745.; Section 240.15d–14 is also issued under secs. 3(a) and 302, Pub.L. 107–204, 116 Stat. 745.; Section 240.15d–15 is also issued under secs. 3(a) and 302, Pub.L. 107–204, 116

Stat. 745.; Sections 240.15Ba1–1 through 240.15Ba1–8 are also issued under sec. 975, Public Law 111–203, 124 Stat. 1376 (2010). ; Section 240.15Bc4–1 is also issued under sec. 975, Public Law 111–203, 124 Stat. 1376 (2010). ; Sections 240.15Ca1–1, 240.15Ca2–1, 240.15Ca2–2, 240.15Ca2–3, 240.15Ca2–4, 240.15Ca2–5, 240.15Cc1–1 also issued under secs. 3, 15C; 15 U.S.C. 78c, 78*o*–5;; Section 240.15Ga–1 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.15Ga–2 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.16a–1(a) is also issued under Public Law 111–203 § 766, 124 Stat. 1799 (2010).; Section 240.17a–3 also issued under secs. 2, 17, 23a, 48 Stat. 897, as amended; 15 U.S.C. 78d–1, 78d–2, 78q; secs. 12, 14, 17, 23(a), 48 Stat. 892, 895, 897, 901; secs. 1, 4, 8, 49 Stat. 1375, 1379; sec. 203(a), 49 Stat. 704; sec. 5, 52 Stat. 1076; sec. 202, 68 Stat. 686; secs. 3, 5, 10, 78 Stat. 565-568, 569, 570, 580

secs. 1, 3, 82 Stat. 454, 455; secs. 28(c), 3–5, 84 Stat. 1435, 1497; sec. 105(b), 88 Stat. 1503; secs. 8, 9, 14, 18, 89 Stat. 117, 118, 137, 155; 15 U.S.C. 78*l*, 78n, 78q, 78w(a); ; Section 240.17a–4 also issued under secs. 2, 17, 23(a), 48 Stat. 897, as amended; 15 U.S.C. 78a, 78d–1, 78d–2; sec. 14, Pub.L. 94–29, 89 Stat. 137 (15 U.S.C. 78a); sec. 18, Pub.L. 94–29, 89 Stat. 155 (15 U.S.C. 78w);; Section 240.17a–23 also issued under 15 U.S.C. 78b, 78c, 78*o*, 78q, and 78w(a);; Section 240.17f–1 is also authorized under sections 2, 17 and 17A, 48 Stat. 891, 89 Stat. 137, 141 (15 U.S.C. 78b, 78q, 78q–1);; Section 240.17g–7 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.17g–8 is also issued under sec. 938, Pub.L. 111–203, 124 Stat. 1376.; Section 240.17g–9 is also issued under sec. 936, Pub.L. 111–203, 124 Stat. 1376.; Section 240.17h–1T also issued under 15 U.S.C. 78q.; Sections 240.17Ac2–1(c) and 240.17Ac2–2 also issued under secs. 17, 17A and 23(a); 48 Stat. 897, as amended, 89 Stat. 137, 141 and 48 Stat. 901 (15 U.S.C. 78q, 78q–1, 78w(a));; Section 240.17Ad–1 is also issued under secs. 2, 17, 17A and 23(a); 48 Stat. 841 as amended, 48 Stat. 897, as amended, 89 Stat. 137, 141, and 48 Stat. 901 (15 U.S.C. 78b, 78q, 78q–1, 78w);; Sections 240.17Ad–5 and 240.17Ad–10 are also issued under secs. 3 and 17A; 48 Stat. 882, as amended, and 89 Stat. (15 U.S.C. 78c and 78q–1);; Section 240.17Ad–7 also issued under 15 U.S.C. 78b, 78q, and 78q–1.; Section 240.17Ad–17 is also issued under Pub.L. 111–203, section 929W, 124 Stat. 1869 (2010).; Section 240.17Ad–22 is also issued under 12 U.S.C. 5464(a)(2).; Section 240.19b–4 is also issued under 12 U.S.C. 5465(e).; Sections 240.19c–4 also issued under secs. 6, 11A, 14, 15A, 19 and 23 of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*–3, and 78s);; Section 240.19c–5 also issued under Sections 6, 11A, and 19 of the Securities Exchange Act of 1934, 48 Stat. 885, as amended, 89 Stat. 111, as amended, and 48 Stat. 898, as amended, 15 U.S.C. 78f, 78k–1, and 78s.; Section 240.21F is also issued under Pub.L. 111–203, § 922(a), 124 Stat. 1841 (2010).; Section 240.31–1 is also issued under sec. 31, 48 Stat. 904, as amended (15 U.S.C. 78ee).

Notes of Decisions (68)

Current through Feb. 3, 2015; 80 FR 5693.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.